**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| RONALD LEE DEERE, AKA Running Deer, *Petitioner-Appellee*, v. VINCE CULLEN, Acting Warden, *Respondent-Appellant*. | No. 10-99013 D.C. No. 2:92-cv-01684-CAS OPINION |

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted
September 17, 2012—San Francisco, California

Filed June 3, 2013

Before: Barry G. Silverman, William A. Fletcher,
and Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Silverman;
Dissent by Judge W. Fletcher

# SUMMARY[*]

## Habeas Corpus/Death Penalty

The panel reversed the district court's grant of a 28 U.S.C. § 2254 habeas corpus petition, based on ineffective assistance of counsel, affirmed the denial of the petition on all other grounds, and remanded for the district court to deny the petition.

The panel reversed the district court's order granting habeas relief based on petitioner's contention that counsel provided ineffective assistance by failing to investigate petitioner's competence to plead guilty. The panel held that, even assuming that petitioner's counsel should have requested a plenary competency hearing, petitioner was not prejudiced because there was no reasonable probability that he would have been found incompetent to plead guilty, given reports by two mental health examiners, counsel's own observations of petitioner based on extensive interaction with him, the observations of the prosecutor and judge, and petitioner's rational reasons for wanting to plead guilty.

The panel affirmed the district court's denial of petitioner's request for discovery and a hearing on the subject of the trial judge's mental competency at the re-sentencing hearing (after the state supreme court remanded for a new penalty phase hearing due to counsel's failure to present mitigating evidence). The panel observed that the state supreme court's failure to express any concern over the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

judge's statements or behavior and its explicit commendation on the way the judge handled the case, alone, compels the conclusion that the judge was not impaired and that counsel was not ineffective by failing to seek his disqualification.

Judge W. Fletcher dissented. He would hold that the district court should have granted an evidentiary hearing on whether the trial judge was mentally competent when he re-sentenced petitioner to death. He would also hold that the district court should have granted an evidentiary hearing on whether the counsel was ineffective in failing to challenge the trial judge's competence during re-sentencing. And he would hold that counsel was ineffective in failing to investigate petitioner's competence to plead guilty during the original proceedings.

**COUNSEL**

Lise S. Jacobson (argued), Deputy Attorney General for the State of California, San Diego, California, for Respondent-Appellant.

Michael Satris (argued), Bolinas, California; and Diana Samuelson, San Francisco, California, for Petitioner-Appellee.

**OPINION**

SILVERMAN, Circuit Judge:

Ronald Deere threatened to kill everyone in Cindy Gleason's family if she were ever to break up with him. On

March 4, 1982, Deere made good on his threat. Upset that Cindy had left him, Deere shot and killed Cindy's brother-in-law, Don Davis, and Davis's two young daughters, ages 7 and 2.

Deere was arrested a few days later. After having been appointed a lawyer, he expressed his desire to withdraw his plea of not guilty and to plead guilty, even though he knew he could face the death penalty. Before the plea was entered, Deere's lawyer arranged for him to be examined by two mental health professionals – a physician with experience in psychiatry, and a psychologist. Both examiners came to remarkably similar conclusions. Both reported that Deere was oriented as to time, place and person. Neither examiner found Deere to suffer from a thought disorder.

Deere told the psychologist, William Jones, Ph.D., that he would prefer a death sentence to life imprisonment. He also said that the death penalty would make him feel better and help the people he hurt. He said that pleading guilty would protect others who would be spared the ordeal of a trial and that by pleading guilty he would protect his family from further publicity.

The physician, Tommy Bolger, M.D., a former staff psychiatrist in the California prison system and elsewhere, opined that Deere did not suffer from mental illness. However, like Dr. Jones, Dr. Bolger diagnosed Deere with severe personality and substance abuse disorders. Bolger concluded that Deere understood the charges against him and was capable of cooperating with counsel if he wanted to.

Deere's lawyer spent countless hours with his client leading up to the change of plea. The lawyer attested that

Deere was fully aware of the ramifications of his decision and was legally competent to plead guilty. Following a change-of-plea colloquy in which Deere indisputably was lucid, engaged, and evidenced knowledge of his situation, the trial judge accepted Deere's guilty plea.

In Deere's present habeas case, he argues that his lawyer was ineffective in 1982 for failing to request a full-blown competency hearing. We hold today that even assuming for the sake of argument that his lawyer should have requested a plenary competency hearing – despite the reports of the two mental health examiners, despite counsel's own observations of Deere based on his extensive interaction with him, despite the observations of the prosecutor and the judge, despite Deere's rational reasons for wanting to plead guilty – Deere nevertheless suffered no prejudice from the lack of a competency hearing because there was no reasonable probability that he would have been found incompetent to plead guilty. As we said in *Dennis v. Budge*, 378 F.3d 880, 890 (9th Cir. 2004), "The question . . . is not whether mental illness substantially affects a *decision*, but whether a mental disease, disorder or defect substantially affects the prisoner's *capacity* to appreciate his options and make a rational choice." *Id.* (Emphasis in the original) There is literally no contemporaneous evidence that Deere lacked the capacity to understand his options and to make a rational decision to accept responsibility for what he did. All of the evidence supports the trial court's findings that Deere's guilty plea was knowing, intelligent and competent. Those findings are presumed correct and have not been rebutted by clear and convincing evidence. *See Evans v. Raines*, 800 F.2d 884, 887 (9th Cir. 1986).

In 1986, after Deere's case had been remanded by the California Supreme Court for the presentation of mitigating evidence and re-sentencing, Deere once again appeared before Superior Court Judge Fred Metheny. At that time, neither Deere's own lawyer, nor the lawyer specially appointed as a friend-of-the-court to present mitigation on Deere's behalf, nor the prosecutor, nor any reviewing court expressed any concern whatsoever about Judge Metheny's mental competence. Five years later, in reviewing the transcript of Judge Metheny's statements at the 1986 re-sentencing, the California Supreme Court said this about Judge Metheny: "[T]he record indicates that the trial court remained scrupulously fair and objective throughout the proceedings. It carefully weighed and considered both the aggravating and mitigating evidence after they were presented." *People v. Deere*, 808 P.2d 1181, 1195 (Cal. 1991) (in bank). The California Supreme Court affirmed every one of Judge Metheny's rulings. Despite this, Deere now seeks discovery and an evidentiary hearing on his claim that his lawyer was ineffective in 1986 for failing to move to disqualify Judge Metheny due to the judge's supposed senility.

We hold today that the district court did not abuse its discretion in denying Deere's request for discovery and a hearing on the issue. First, Deere came forward with no admissible evidence that the judge was mentally impaired in 1986. The most Deere offered were anecdotes recounted by a grand total of three lawyers, anecdotes that are either hearsay, or that do not shed light on Judge Metheny's mental status in 1986, or that reveal no more than eccentricity as distinguished from dementia. Tellingly, although Deere's habeas counsel had access to a stable of mental health professionals, counsel furnished nothing – zero – from any

mental health professional opining that any of the stories about Judge Metheny might be indicative of mental impairment or even that they warrant further investigation. Second, there is absolutely nothing to show that any of the supposed incidents involving other lawyers were ever communicated to Deere's lawyer. Deere's lawyer can hardly be faulted for failing to act upon gossip that was never passed along to him. Third, the California Supreme Court reviewed Judge Metheny's handling of the 1986 proceeding, affirmed him in toto, and found that he was scrupulously fair and objective throughout the proceeding, and that he carefully weighed and considered the evidence. This appellate ruling demonstrates two things: First, that Judge Metheny was not impaired in 1986; and second, if the state supreme court had no cause to question Judge Metheny's mental status, neither did Deere's counsel.

## I.  Background

Cindy Gleason was Deere's former girlfriend and the mother of his baby daughter. Don Davis was married to Cindy's sister Kathy. Kathy and Don had two daughters, Michelle and Melissa.

Cindy broke up with Deere around February 26, 1982. Some time on or after March 1, Deere took a .22 caliber single-action Ithaca rifle from the home of an acquaintance, Marc Nelson.

On March 2, 1982, Deere told Kathy that he was mad at Don for implying that Kathy was involved with Deere. Deere also told Kathy that he was going to do something that would cause her to hate him. But Deere wouldn't be around for her to hate. Bruce Norton, a friend of Kathy's, was present

during the conversation. After Kathy left, Deere told Norton, "I'm gonna leave town, but I've got something to do first." Deere added that he only thought he'd get a couple of years in prison if he killed a couple of people. Norton testified that Deere did not appear to be intoxicated at the time.

Two days later, on March 4, 1982, Deere was seen around town either drunk or in a daze. Deere telephoned Cindy around 3:20 p.m. and said, "I'm not going to be responsible for what I do today." Deere then walked to the Davis trailer, broke in and waited for Davis to return. Davis called Cindy around 4:00 p.m. to say that someone had been in his trailer. Cindy asked Davis to call her back and let her know if anything was missing. Davis never called back. Later that evening Cindy and Kathy found the bodies of Davis and the two children in the Davis trailer. They had been shot with a .22 caliber rifle.

On March 9, 1982, five days after the murders, police found Deere camping in the desert near Blythe, and arrested him. Deere told the officers, "I was going to call out to you but I was afraid I would be shot." At Deere's campsite, police found Nelson's .22 caliber rifle (later confirmed as the murder weapon), .22 caliber bullets, a glass and some pictures of Cindy taken from the Davis trailer and letters written by Deere to his family. Davis's pickup truck was found in a ditch adjacent to where Deere was found.

Riverside Police officers immediately requested that Tommy Bolger, M.D., the consulting psychiatrist for Riverside County, interview Deere at the jail. Dr. Bolger had obtained a Doctor of Osteopathy degree in 1957. However, he was allowed to use the "M.D." designation pursuant to the California Reunification Act of 1962. Cal. Bus. & Prof. Code

§ 2396 (1962); Cal. Bus. & Prof. Code § 2275 (2012). Dr. Bolger had worked as a surgeon and medical doctor and trained in psychiatry at Patton State Hospital from 1965 through 1970. In 1975, he was hired as Chief Medical Officer at San Quentin. In September of the same year, he transferred to Soledad State Prison, where he served as a staff psychiatrist from 1977 through 1979. When he resigned from Soledad, Dr. Bolger moved to Blythe, opened a medical/psychiatric practice and consulted as a psychiatrist for Riverside and San Bernardino Counties. Dr. Bolger died in 1987.[1]

On March 9, 1982, the day Deere was arrested, Dr. Bolger interviewed Deere at the police station for a little over an hour. The next day, Dr. Bolger wrote that Deere was cooperative and competent. Deere had acknowledged that he was aware that anything he told Dr. Bolger could be used against him in court.

Dr. Bolger obtained a complete history from Deere during the interview. Deere told Dr. Bolger that he was being held for three counts of murder. He said he had threatened to kill

---

[1] In 1986, Bolger testified in this case that he was board-certified in psychiatry and internal medicine. In 1987, he testified in a different case that he was not board-certified in any speciality. It is possible, of course, that Bolger intentionally lied in 1986. It is also possible that there was a transcription error or some other explanation for a statement that is so easily refuted. What is puzzling about this is the absence of any evidence in the record that Bolger, in a career that spanned 30 years, ever misrepresented his credentials in a job application, résumé, or testimony on any *other* occasion. In March, 2007, 20 years after Bolger died, the parties stipulated that Bolger was never board-certified, but the explanation for his 1986 statement – a deliberate falsehood or something else – remains a mystery.

Cindy, his common-law-wife, if she left him. Deere and Cindy had a six-month-old child. Cindy had another daughter from a previous relationship. Deere stated that he knew Don, Kathy, Michelle and Melissa "well" because Deere, Cindy, their daughter and Cindy's other daughter had lived with the Davis family until Cindy left Deere. Kathy was divorcing Don. Deere claimed that he loved Melissa and Michelle. The girls were "real sweeties" who had played with his children. Deere stated, "I don't know why I did this. I hope that if I am convicted that I will get the gas chamber."

Deere also told Dr. Bolger he had been in special education classes, did poorly in school and had a history of self-mutilation and alcohol and drug abuse. Deere stated that he cut himself or broke things when he got "enraged."

Dr. Bolger opined that Deere "answers appropriately." He is "oriented as to place, time and date," and is not delusional. Dr. Bolger wrote that Deere is not mentally ill, but has "a severe personality problem." He "does understand the nature and the charges against him" and "was certainly capable of forming the intent and then carrying out the action." Finally, Dr. Bolger opined that Deere "is capable of cooperating with counsel in his defense, if he feels it is to his advantage."

Dr. Bolger diagnosed a "Dependent personality type, with explosive features, Alcohol and drugs as factor" and an "Antisocial personality type, with borderline features, not psychotic."

On the same day Dr. Bolger provided his report to police, Glenn S. Jones was appointed to defend Deere. Mr. Jones, a Riverside County Public Defender, had been admitted to the

bar in 1972. Before representing Deere, Mr. Jones had practiced for 10 years as a criminal defense trial attorney, with eight years as an assistant public defender. Mr. Jones had represented defendants in "a couple of dozen" murder cases, with one prior death penalty case.

Deere initially pled not guilty. Mr. Jones testified in 1998 that he had repeatedly discussed the case with Deere "dozens of times" for hours at a time. From 1982 through 1986, Deere consistently told Mr. Jones that he intended to plead guilty, waive a jury trial and request the death penalty. Mr. Jones said that Deere consistently gave three reasons for wanting to plead guilty, even if it meant the death penalty. First, Deere was "concerned about his family and friends, his relationships." Deere "did not want anything done what would in any way bring sadness or pain to" his family. He "had done enough, and he wasn't going to do anymore." Second, he wanted to show that he had dignity and morality. Third, Deere wanted to take responsibility for his actions because he had committed the crimes and believed in capital punishment.

Mr. Jones would later testify that at the outset of the representation he would not consent to Deere pleading guilty. But "over time," Mr. Jones concluded that, although Deere was not well-educated, he was "very intelligent" and "very articulate." As a result of their numerous conversations, Mr. Jones had "absolutely no doubt that Deere was competent." Mr. Jones stated:

> [Deere's] discussions with me were always vivid and intelligent, no indication that he did not know what we were doing, with the consequences of what we were doing. He

knew exactly what he was charged with and what the proceedings were all about. There were just no hallmarks of incompetency there at all.

Mr. Jones also testified in 1998 that there "was never a question in [his] mind" that Deere was able to assist with his defense:

He had the ability. It was a very reasoned decision he made as to what he wanted to do, which was the reason why he acted the way he did or said what he said or did what he did. Not because he was acting under any delusion or hallucination or fantasy or any kind of psychiatric or psychological, you know, reason for his behavior.

Mr. Jones added that Deere cooperated with his defense by listening to and discussing Mr. Jones's suggestions, signing releases, never refusing to talk to Mr. Jones, and not interrupting discussions or walking out.

Mr. Jones also stated that he "found no indication that [Deere's] desire to plead guilty and obtain the death penalty had anything to do with a death wish or that there was any suicidal impulse behind [Deere's] desire to plead guilty." Rather, Deere pled guilty "out of a strong sense of justice he had that he deserved the death penalty; it was a moral statement of principle that I accepted." "It was clear" to Mr. Jones that Deere "understood every aspect of the proceeding." Mr. Jones added, "I have dealt with hundreds, thousands of defendants, and [Deere] did not in any way, shape, or form impress me as being incompetent."

Deere eventually persuaded Mr. Jones that he wanted to plead guilty, was competent to plead guilty and was prepared to take responsibility for his actions.

Mr. Jones testified in 1998 that he wanted to pursue insanity and diminished capacity mental health defenses in 1982. He obtained funding for mental health experts, intended to hire at least one psychologist and psychiatrist and he hired a psychologist, William Jones, Ph.D. (no relation to Mr. Jones), to evaluate Deere for mental health defenses. Mr. Jones requested Dr. Jones to perform a general mental examination of Deere, but not to assess him for competency. His reason for this was two-fold: first, he did not doubt Deere's competency; and second, it was his practice to use separate experts for competency questions and mental health defenses.

Mr. Jones and Deere had several discussions about possible mental health defenses. But, Deere consistently refused to "do anything inconsistent with his ultimate choice," to accept responsibility for what he had done. Deere convinced Mr. Jones that "he would have no part in any kind of mental defense."

On June 18, 1982, Deere moved to change his pleas to guilty. Judge Fred Metheny presided over Deere's case. Because the Information did not specify the degrees of murder, the parties agreed that the judge would decide the degrees of murder and special circumstances if the guilty plea were accepted. Judge Metheny advised Deere that he could be facing the death penalty if he pled guilty. Deere assured the judge that he had discussed his case with Mr. Jones. The prosecutor then suggested that before the court entertain a change of plea, it should appoint a psychiatrist to examine

Deere for competence just to make sure that the plea was "proper and just." The prosecutor recommended Dr. Bolger, who had "previously examined" Deere. Mr. Jones agreed to Dr. Bolger's appointment. Judge Metheny then appointed Dr. Bolger to examine Deere.

Dr. Bolger interviewed and tested Deere for an additional hour and a half and provided his second written report dated June 21, 1982. Dr. Bolger found Deere "extremely cooperative and alert." Deere's mood was "stable . . . neither being depressed nor unduly elated." Deere denied delusions and hallucinations. Dr. Bolger found "no evidence of organicity." Dr. Bolger also opined that Deere showed no evidence of psychosis or abnormal thinking and was not mentally ill.

Dr. Bolger further opined that Deere was "able to carry his ideas to goal." He was "well aware of the charges" and "implications of pleading guilty." Deere had been "well advised" and was "aware of and able to understand the meaning of the waiver of the rights to a jury trial." He was "able to adequately assist his attorney in the preparation and the presentation of his case." Finally, Deere was aware of a probability of a death sentence. But, he also knew that a court would decide the sentence. Deere was motivated to having "as short a trial as possible . . . since he indicate[d] that either pleading guilty or not guilty would in all probability result in the same decision."

At the same time Dr. Bolger was examining Deere, Mr. Jones was pursuing a separate mental health defense examination by Dr. Jones because, even if a guilty plea were accepted, there would still be a trial to determine the degree of murder. Mr. Jones testified in 1998 that, after hours of

discussion with Deere, Deere agreed to meet with Dr. Jones. On June 23, 1982, Dr. Jones examined and tested Deere for one and a half hours.

Two days later, on June 25, 1982, Deere advised the court that he intended to plead guilty to the three counts of murder. Judge Metheny found that Deere's appearance, actions, comments and conduct in court had established that Deere understood the charges and was "ready, willing and able to cooperate" with defense counsel. Dr. Bolger's report, Judge Metheny stated, had confirmed the judge's observations that Deere was competent. Mr. Jones agreed that Deere was competent, stating:

> I have seen no evidence in Mr. Deere that would suggest that he's in any way incompetent. I've reviewed with him the report of Dr. Bolger, and I'd be willing to stipulate at this time the Court may accept the report and base its rulings on the report.

The prosecutor "concur[ed] with Mr. Jones' evaluation of Mr. Deere's mental state" and also stipulated that the court could consider Dr. Bolger's report that Deere was aware of the charges, understood his waiver and was competent.

The change of plea transcript establishes that Deere was lucid, clearly understood the proceedings and consulted with counsel when he wanted to. Judge Metheny extensively questioned Deere about the rights Deere was waiving, and Deere responded appropriately. When asked to explain his understanding of the right to a jury trial, Deere said, "twelve people, you know, find out if you're guilty or not, on the evidence they have." When asked what the charges were,

Deere responded, "[t]hree counts of murder." Judge Metheny then asked Deere, "what is your understanding of the nature of that charge?" Deere conferred with Mr. Jones and responded, "[i]ntentional killings with malice." In response to Judge Metheny's question of what Deere had done to be charged with murder, Deere stated:

> On March 4th, 1982, at about 4:00 p.m. I shot, with intent to kill and did kill Don Davis, Melissa, – I mean Michelle Davis, Melissa Davis. I used a .22 caliber rifle, and the shootings took place at the Davis' home near Blythe, Riverside County, California. At the time of the shootings, none of the three victims did anything to provoke me in any way.

When asked what sentence he was facing, Deere responded, "death or life in prison." In response to the question regarding what sentence he faced for using the rifle, Deere conferred with counsel and responded, "anything less than life, you know, would add two years to any other sentence." Finally, Judge Metheny asked Deere, "who do you believe will decide what your sentence will be?" Deere responded, "[t]he judge or the jury."

When the judge asked Mr. Jones about the possibility of an insanity defense or mental states defense, Mr. Jones responded:

> Your honor, I have spent a great deal of effort and time investigating the possibility of insanity defense or some other mentally related defense. It is my firm conclusion that

there is no such defense; and even if there were, Mr. Deere has advised me that he, under no circumstances, will enter a plea of guilty by reason of insanity.

I find no evidence to support any defense that would reduce these charges to manslaughter.

Mr. Jones then concurred in the plea and reaffirmed his belief that Deere was competent to enter the plea:

As to this particular case, Mr. Deere and I have spent literally hours discussing the case, debating the case, literally arguing about what is appropriate. I think it's rather obvious that a man's pleading guilty in a capital case is rare. And when I began this case, I didn't even consider – it didn't even enter my mind that I would consent to such a plea. And Mr. Deere has slowly but surely persuaded me that this is what he wishes to do, that he's competent to do it, and he's prepared to take the full responsibility for his actions. And I can find absolutely no basis, in my experience, training or the investigation of this case, which would suggest he should not be permitted to do exactly what he wants to do, knowing the consequences of his act.

Mr. Jones advised the court that Deere had given Mr. Jones three reasons for pleading guilty. First, Deere wanted to take responsibility for his actions and "maintain[] a small amount of dignity as a human being." Mr. Jones explained, "[h]e

knows that doesn't change what happened. He knows it doesn't change the agony and the hurt that he's caused the survivors, but it's the one thing he can do to show that he can take responsibility." Second, Deere wanted to protect his family and the victims' family from a "highly publicized" trial and "more agony." Third, Deere knew he would be found guilty, favored capital punishment and was willing to face justice. Mr. Jones explained:

> Mr. Deere and I have debated the theory of capital punishment quite a bit. He is in favor of capital punishment, and I am not. He thinks that this case is an appropriate case for capital punishment, and he simply feels that justice should be done in this case, and he feels that pleading guilty and taking what results has justice; whatever happens, happens . . . He knows the result of a jury trial. He knows what would happen if the case went to jury trial, and he feels that the expense of a circus or charade of a trial is not right for him or for the community.

Deere then pled guilty to three open counts of murder[2] and admitted to using the gun. Judge Metheny found that the guilty pleas were knowing, voluntary and supported by a factual basis.

Five days after the change of plea hearing, Deere again met with Dr. Jones for the continuation of the examination Mr. Jones requested in aid of proceedings yet to come to

---

[2] The degrees of murder were left for the judge to decide in a subsequent proceeding.

determine the degree of murder and the penalty. Dr. Jones met with and tested Deere for about the same length of time that Dr. Bolger had met with and tested Deere. Dr. Jones's 1982 findings, conclusions and diagnoses were amazingly similar to Dr. Bolger's. Dr. Jones opined in 1982 that "Deere was oriented as to time, place, and person" and "aware of the charges against him." He was "generally cooperative." Deere had "no obvious thought disorders in his communication." His memory was "generally adequate." He denied hallucinations and delusions. Deere's tests were "within normal limits" and did not indicate visual motor or neurological dysfunction. Dr. Jones also opined that Deere cut himself to discharge anger, get attention and sympathy and to manipulate others. Dr. Jones concluded that the self-mutilation was "a very powerful attention-getting device."

Deere told Dr. Jones that he cooperated because defense counsel "told him that lack of cooperation in a psychological evaluation might jeopardize his conviction." Deere "wished to be found guilty and to accept whatever punishment the court would impose." Deere also told Dr. Jones that he was "willing to accept" the death penalty and "indeed would prefer it to life imprisonment." Deere stated that a death sentence would make him feel better, "help the people he has hurt," protect others from participating in trial, protect his family and keep the matter out of the newspapers. Pleading guilty, Dr. Jones opined, was "a further extension of [Deere's] very strong masochistic tendencies."

Dr. Jones diagnosed Deere with adjustment disorder with depressed mood; mixed substance abuse disorder, including abuse of alcohol, marijuana, stimulants, amphetamines; and borderline personality disorder with anti-social aspects. In other words, Dr. Jones and Dr. Bolger basically came to the

same conclusions. Mr. Jones would later testify that none of the reports, including the reports from Dr. Bolger, Dr. Jones and the two private investigators that Mr. Jones hired, gave Mr. Jones any information that would have caused him to question Deere's competence.

On July 23, 1982, the parties returned to court for Judge Metheny to determine the degrees of the three murders. Mr. Jones testified in 1998 that he and Deere had vigorously discussed the issue. Mr. Jones wanted to go for a second degree murder finding. Like all their conversations, it was "give and take:"

> He always knew what he wanted, and he was going to get what he wanted to get. And we dealt with each other very civilly on all the vigorous points, so it wasn't simply him being absolutely uncooperative with me at some point or not. There were always discussions, and eventually when we would do something his way, it was because: "Okay, Ronnie, we've discussed this, and its obviously what you want to do, and I can't see a reason at this point in doing something different."

Mr. Jones testified that, even though Deere didn't like his position regarding second degree murder, Deere agreed to let Mr. Jones argue that the crimes were second, not first, degree murder.

The parties stipulated that Judge Metheny could consider the preliminary hearing testimony to determine the degrees of murder. Again, Deere was alert and engaged. At the prosecutor's request, Judge Metheny again advised Deere that

a first degree murder finding would require a penalty phase and could result in a death sentence. Deere responded appropriately to the judge's questions and waived his rights.

When Judge Metheny expressed concern that the preliminary hearing testimony might not establish Deere's state of mind at the time of the crimes, Mr. Jones responded that Deere had given specific instructions not to offer evidence regarding the degrees of murder and asked to continue the discussion in chambers. In chambers, Judge Metheny unsuccessfully tried to convince Deere to allow mental health expert testimony. Judge Metheny explained to Deere that state of mind evidence would help establish first or second degree murder. He suggested that Deere allow Dr. Bolger to testify. Deere responded that he didn't "agree upon all the doctors." The judge advised Deere that he would not have to testify, but asked Deere to agree to let the doctors testify.

However, at the next hearing, Mr. Jones advised the court that he would not be offering Dr. Bolger's testimony because Deere objected to having private family matters discussed in court. Deere confirmed that he agreed with defense counsel.[3]

---

[3] MR JONES: Your Honor, at this time we will not offer any evidence on the issue of degree. I've discussed the matter with Mr. Deere, and it is his specific instructions that we not call Dr. Bolger. His reasons are personal. He knows that Dr. Bolger would be revealing conversations he's had with him, which he feels are private. And Dr. Bolger will be discussing family matters, Ronnie's childhood and his brothers and sisters and that sort of thing, and he's instructed me we are not to call Dr. Bolger as a witness; and so at this time we would not offer any evidence.

The prosecutor declined to present additional evidence and reaffirmed that he believed that Deere was competent, making rational decisions and acting appropriately. Judge Metheny agreed with the prosecutor's assessment, and again found that Deere was competent and rational.

The prosecutor argued for first degree murder because the evidence showed that Deere planned the murder for days and then carried out his plan. Deere shot the girls, he argued, because they were witnesses. Mr. Jones argued for second degree murder, citing evidence that Deere was suffering emotional turmoil and intoxicated. In addition, Mr. Jones argued that the children did not live at the trailer, and there was no way Deere could know the girls would be with their father that afternoon. Thus, premeditation as to them was lacking.

Judge Metheny then found that the killing of the two children was second degree murder, but that the killing of Don Davis was first degree murder. In a nuanced ruling, the judge reasoned that Deere clearly planned and intended to kill the father, but had not anticipated that the children would be present. Because the evidence regarding the children could be reasonably interpreted as either first or second degree murder, Judge Metheny found Deere guilty of the second degree murder of the children.

Judge Metheny also found that the multiple murder allegation was true: Deere committed multiple first and

---

THE COURT: I take it that's what you want to do, Mr. Deere; is that right?

THE DEFENDANT: Yes.

second degree murders. This finding made Deere eligible for the death penalty.

At the penalty phase hearing, Deere attempted to waive his right to a jury trial. But the prosecutor refused to waive the state's right. Deere indicated his intention to absent himself. Mr. Jones explained to the court:

> You know, he wants a death verdict. He said that over and over again. And any procedure that may impede that he just doesn't want to have any part of, and he sees a jury trial on the penalty phase as possibly resulting in a verdict other than a death penalty. So that's his line of thinking. It's very rational, and I don't see any possible basis for concluding that he's not competent. His lack of cooperation doesn't stem from any mental disability. It stems from his very logical decision about what he wants as a result.

Ultimately, the parties agreed to waive a penalty jury. The judge again found Deere competent:

> I think you're competent to make that decision. I've listened to that decision for a number of times now, and I haven't the slightest doubt that you have the ability and the right to make that decision.

At the continued penalty hearing, Deere reaffirmed that he wanted to waive his right to a jury trial at the penalty phase and understood the rights he was waiving. After Mr.

Jones and the prosecutor concurred in the waiver, Judge Metheny found Deere's waiver to be knowing and voluntary.

At Deere's request, Mr. Jones did not present mitigation evidence. Instead, the parties stipulated that Judge Metheny could consider the evidence already admitted at the degree of murder hearing. Judge Metheny made sure that Deere concurred and understood that he was waiving his right to confront witnesses and found Deere's waiver to be knowing and voluntary.

Deere expressed remorse for the crimes and said that he deserved to die. Mr. Jones then commented that Deere's actions were "unprecedented." But, Deere had communicated his feelings "steadfastly since practically the first day." Deere had "slowly but surely swayed" Mr. Jones to permit him to plead guilty, admit the special circumstances, waive jury trials for the guilt and penalty phases and decline to present mitigating evidence. Mr. Jones and Deere had "argued quite vociferously about what to do in this case." But Deere stated that he didn't want to cheapen his relationships. He did not deserve mercy and would lose his "last vestige of dignity" if he begged for mercy. The only thing Deere could do to show the victims' family that he was sorry was to accept full responsibility for his actions.

Mr. Jones advised the court that each decision was made "in close consultation with" Deere, who knew "the consequences of every decision he's made, as well as the consequences of his criminal acts." Mr. Jones added that Deere's "decisions are not suicidal, crazy decisions. They are rational, intelligent decisions by a man who realizes what he has done and says, 'This is the only position I can take to show you that I am still a man and not an animal.'"

Judge Metheny then sentenced Deere to 15 years to life for the murder of each of the children and to death for the first degree murder of their father.

On December 31, 1985, the California Supreme Court affirmed the convictions and special circumstance finding, but reversed the death sentence. *People v. Deere*, 710 P.2d 925, 926 (Cal. 1985).

Different counsel appointed for Deere by the state supreme court for the automatic direct appeal argued that the trial court should have conducted a *sua sponte* competency hearing because preliminary hearing testimony showed that "shortly before the murders" Deere asked Kathy Davis to kill him, had exhibited suicidal tendencies and had cut himself with a razor blade in the past and "was frequently intoxicated." Deere claimed that his guilty plea and waiver of a jury trial amounted to a suicide attempt. *Id.* at 927. The California Supreme Court rejected the claim, holding that the record did not show "substantial evidence" of mental incompetence. *Id.* at 928. Rather, the trial court and defense counsel believed Deere to be competent. The trial court had appointed the mental health expert, Dr. Bolger, "'to be certain' of defendant's ability to stand trial and cooperate with counsel," even though there was no evidence of incompetence before the court. *Id.* at 927–28. The mental health expert found Deere mentally competent to plead guilty. The expert opined that Deere "displayed no evidence of psychosis, abnormal thinking or mental illness" and was aware of the charges and the consequences of waiving a jury trial. *Id.* at 927.

The California Supreme Court also held that neither the decision to plead guilty nor the waiver of a jury trial

established incompetence, reasoning that Deere gave rational reasons for pleading guilty and avoiding a jury trial. *Id.* at 927–28. He "felt great remorse for his offenses and was prepared to suffer the consequences of a judgment of death." *Id.* at 927. He also didn't want a long drawn-out jury trial. He didn't want "to waste his time listening to trial counsel 'yak' about which prospective jurors were opposed to the death penalty and which were not." *Id.* at 928.

Although the California Supreme Court affirmed the convictions and life sentences, it reversed the death sentence, holding that counsel's honest, but mistaken, belief that he should not present mitigating evidence because of his client's wish to present no evidence nevertheless denied Deere effective assistance of counsel. *Id.* at 931–34. The case was remanded for a new penalty phase trial.

In 1986, Judge Metheny convened the penalty phase trial. Again, Deere was lucid and understood the proceedings. Deere consistently reaffirmed his jury trial waiver and opposition to mitigating evidence.[4]

---

[4]     THE COURT: I assume, Mr. Deere, that you are willing and want to have Mr. Jones represent you –

THE DEFENDANT: Yes.

THE COURT: – from here on out again?

THE DEFENDANT: Yes.

THE COURT: And do you understand what I told you about the Supreme Court's ruling to the effect that we have to continue with the trial?

THE DEFENDANT: Yes, I have read the report. I

have one, too. I read it all.

THE COURT: I don't really believe we're ready to go to trial today; do you, gentlemen?

MR. JONES: No, that's correct, Your Honor. . . I've discussed with Mr. Deere his desires, in terms of whether he wants a jury trial or a court trial. He clearly advised me he does not want a jury trial. His previous waiver of jury is still his desire.

THE COURT: Of course, you understand you have the right to have a jury trial, if you wish to have it.

THE DEFENDANT: Yes.

* * *

THE COURT: . . [The trial] will be limited to the mitigating and aggravating circumstances. You know what that means. I'm sure of that.

THE DEFENDANT: Yes.

THE COURT: And you have a right – and your attorney, Mr. Jones, will get this set up – you will have a right to put on the individuals who will testify for you as to mitigating circumstances. I will be the judge and the finder of fact on this particular question and issue as to whether the mitigating circumstances outweigh the aggravating circumstances.

That puts us in a position where the court has the responsibility to determine whether or not the sentence would be life imprisonment or whether it would be the death penalty, or there's a possibility that there could be some other conclusion.

THE DEFENDANT: Yes.

Judge Metheny found Deere competent and the waiver knowing:

> THE COURT: Very well. . . . The court does find at this time that Mr. Deere – as he did the last time – completely understands what we've discussed. I've never had any doubt about his intelligence and ability to understand. I think he's made his decision fairly based on the facts we've discussed this morning.

At the continued hearing, Mr. Jones added:

> I have discussed in detail with Mr. Deere his desires and he's made them very clear to me. He does not change his position in any matter. He previously waived jury trial and continues to waive jury trial. He wants nothing to do with the jury trial. And I believe he's satisfied with the way I've handled the case. He's certainly indicated nothing to me that he's dissatisfied in any way, shape, or form with my performance.

---

THE COURT: Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Do you have any questions?

THE DEFENDANT: No.

Judge Metheny then directly addressed Deere to make sure that Deere understood and continued to waive his right to a jury trial:

> THE COURT: You know originally we went through this before in great detail that you had a right to the jury and you had a right to have the jury decide if you were found guilty of first degree murder. Then the jury would decide according to the aggravating and mitigating circumstances. You did waive that. The last time you were in here, just a few weeks ago I asked you again. I don't mean to be facetious about this. I just want to have this done fairly. And I can assure you, and I want the record to reflect this, that I haven't made up my mind yet at all.
>
> I'm going to have to listen to the evidence. I can assure you I'm going to be fair. If I felt otherwise, I would not go any further with this case.
>
> I'm asking you right now, Mr. Deere, if you want us to pick a jury and go back to the aggravating and mitigating circumstances?
>
> THE DEFENDANT: No. I'm satisfied the way it is right now. I don't want a jury.

The prosecution offered only the aggravation evidence presented in the first trial. Despite the fact that the case had been remanded due to ineffective assistance of counsel for Mr. Jones's failure to set forth mitigating evidence, Mr. Jones

again refused to put on any mitigation. Mr. Jones said, "[a]s I indicated during the first trial from day one Ronnie Deere has told me exactly how he wants this case to be handled. He's never changed once." Mr. Jones also re-affirmed that Deere was competent and rational:

> He has convinced me that he knows what he's doing. He's not crazy. He's not incompetent. He's not insane. He knows exactly what he's doing. He knows what he did to be convicted of these crimes and he knows – or he believes in his heart that justice should be done.

Mr. Jones repeated that Deere did not want a trial or evidence:

> He does not want any evidence presented on his behalf because in his heart that is his private life and to bring that evidence into court would violate his relationships with everybody he holds dear and respects in the world. And to him, those relationships are more important than anything else, including his life.

Although the judge threatened Mr. Jones with contempt if he didn't present mitigation, Mr. Jones reaffirmed that contempt would not change his mind. Mr. Jones again explained that Deere had "slowly but surely convinced" him not to present evidence. He believed Deere had "made his decisions consciously, temperately, and not in the heat of passion, but based on his true and sincere and honest beliefs about what is right for him." After Mr. Jones again refused to admit mitigating evidence, Judge Metheny found the

Riverside Public Defender's Office and Mr. Jones in contempt and reinstated the death penalty.

Less than a month later, Judge Metheny stayed that order and appointed an attorney, Jonathan Landau, as a friend of the court, and an investigator, Richard Welby, to investigate and present mitigating evidence to the court. In addition, the California Supreme Court struck the "stayed" death sentence as "having been entered through inadvertence."[5] After the state supreme court vacated the death penalty order, Judge Metheny vacated the contempt order.

At the continued hearing, now with Mr. Landau present as an amicus, Deere reaffirmed his jury waiver. Mr. Landau discussed the mitigation evidence from the preliminary hearing transcripts, and then presented six mitigation witnesses, including Dr. Bolger. Dr. Bolger opined that Deere suffered from diminished capacity at the time of the murders because he was under the influence of alcohol or drugs, stressed and traumatized. Dr. Bolger testified that, although Deere had a hard time expressing his remorse, he was "extremely remorseful over the death of the two children" and "the influence that this whole thing would have upon his daughter." Dr. Bolger also believed that Deere

---

[5] A "Commitment Judgment of Death" was filed by the Clerk of Court on April 22, 1986. On May 14, 1986, Judge Metheny stayed the sentence to obtain mitigating evidence and scheduled a penalty hearing for June 27, 1986. In a May 19, 1986 minute order, Judge Metheny appointed Richard Welby, a licensed private investigator, to investigate for mitigating evidence. Citing the May 19 order, the California Supreme Court subsequently concluded that the April 22 judgment was "through inadvertence, prematurely filed." It ordered the judgment stricken and returned the case to the trial court.

could be of benefit to himself and society if spared the death penalty and imprisoned for life instead.

Investigator Welby testified about his investigation, adding that he had found that Deere cared about his mother and father and never forgot a birthday or holiday. A neighbor testified that Deere had helped her with yard work. Deere's sister testified that Deere was upset at the time of the murders because of his deteriorating relationship with Cindy. Deere loved his daughter, had been a protective brother and had never been violent. Deere's mother testified that she loved her son and wanted him to live. Finally, Mr. Landau introduced a piece of Deere's art to show the work he could accomplish in prison.

After Mr. Landau argued that life in prison would be more punishment than a death sentence, Deere asked to respond. This is what he said:

> THE DEFENDANT: I'd like to make a statement due to his saying about my being in prison for life. That that would be punishment, you know.
>
> THE COURT: A punishment to you?
>
> THE DEFENDANT: I understand what he's saying. I don't think he really knows much about prison life. He's going by hearsay. I'm going to state something that I'm pretty sure that if they want to check it out they can check it out with the guards.

Being in prison for all your life for the rest of your life – don't think I do without the luxuries on the streets. I drink every Friday night, every Saturday night. I smoke my weed everyday. You tell me how being in prison the rest of my life is really a punishment. I see my old lady every week. If I get married then I get contact visits. So he doesn't really know what punishment is. I go to the yard seven days a week. I sit there if I got a hangover, then I'll go out.

How can he say – he's never been there. He doesn't know what he's talking about. How does that benefit society? I committed a crime punishable by death. I'm not looking at as an eye for an eye. I didn't write the law. The law stated I committed a crime punishable by death. Not sitting there for the rest of my life which costs taxpayers a lot of money.

I'm sitting in there doing what I did out here. I smoke weed everyday. You can ask any guards there. They will verify that. Whatever is out there is in here. I make money off my artwork. I make thousands of dollars off my artwork. It doesn't hurt me a bit to pay the money for drugs or drinking. I live comfortable.

If they think that's punishment, then you go ahead and make your decision from that. I can live a life like that. The rest of my life.

When Judge Metheny responded that he had to "make a decision based upon the evidence," Deere added:

> I believe in justice. I believe Kathy has a right to justice. I don't look at this as an eye for an eye. I don't think two wrongs make a right. I look at it as the law stated. I committed a crime punishable by death. I should have been punished a long time ago by that law.

Mr. Jones then argued for a life sentence because of the absence of aggravating circumstances and the stress Deere was under at the time of the offenses. Judge Metheny weighed all of the mitigating and aggravating evidence and again sentenced Deere to death.

On May 2, 1991, the California Supreme Court affirmed the convictions and death sentence. *Deere*, 808 P.2d at 1195. Different appellate counsel, again appointed by the state supreme court for the automatic direct appeal, argued that counsel was ineffective for failing to investigate competence in light of the fact that Deere was despondent, had cut himself and was suicidal. *Id.* at 1186. The California Supreme Court rejected the ineffective assistance claim, reaffirming its prior holding that Deere's history of cutting of himself with razor blades when his girlfriend threatened to leave and asking Kathy Davis to kill him two days before the murders did not establish that he was incompetent to plead guilty or stand trial. *Id.* The court said:

> [N]othing at the penalty retrial suggested that the state of defendant's mental competence had changed for the worse.

> Indeed, the trial court inquired of defendant directly on several occasions whether he wished to waive his right to a jury trial. In each instance, defendant responded clearly and unequivocally that he did. The trial court also observed for the record that defendant appeared to be rational and intelligent.

*Id.*

The California Supreme Court also affirmed the death sentence, holding that Judge Metheny "proceeded with a careful and detailed analysis of the evidence relevant to the penalty determination, with specific reference to the statutory mitigating and aggravating factors." *Id.* at 1190. After listing all of the evidence considered by Judge Metheny, the California Supreme Court held that "the record leaves no doubt that the court's sentencing decision was guided by clear and proper standards." *Id.*

Deere filed his first petition for writ of habeas corpus in federal court on May 18, 1993, and amended the petition on July 11, 1994, claiming, among other things, that he was incompetent to plead guilty and that Mr. Jones rendered ineffective assistance of counsel in failing to establish his incompetence. In support of these allegations, Deere's habeas counsel furnished a new report from Dr. Jones and the report of Frank Rosenthal, Ph.D., M.D., a psychiatrist. In a December 1, 1993 affidavit, signed 11 years after the convictions, Dr. Jones opined that:

> Mr. Deere was competent in the limited sense of knowing what was going on around him, so that he understood the nature of the criminal

proceedings; however, Mr. Deere's mental disorders rendered him unable to assist counsel in the conduct of a defense in a rational manner. Mr. Deere's initial refusal to cooperate with my evaluation of him and his eventual failure to complete the testing were themselves indicators of his inability to rationally cooperate in the presentation of a defense. Mr. Deere simply was not able to make logical judgments about his defense, rather, he had a compulsion to be punished with the death penalty and did not want anyone to interfere with that. Mr. Deere's insistence on pleading guilty was part of that compulsion and an outgrowth of his mental disturbances, it was irrational. It did not appear to me that Mr. Deere was capable of making a knowing, voluntary, intelligent decision to so plead.

\* \* \*

In sum, it appeared to me that Mr. Deere was so bent on self-destruction that it disabled him from cooperating in a meaningful way with the presentation of a defense and caused him to solicit the death penalty.

*Deere v. Woodford*, 339 F.3d 1084, 1085 (9th Cir. 2003) (*Deere I*). Dr. Jones later testified at his deposition that Deere's desire to accept responsibility for his crimes "was probably substantially based on the self-destructive aspect of his personality."

Hired by habeas counsel, Dr. Rosenthal came on the scene in 1992 and examined and tested Deere 10 years after the conviction. Dr. Rosenthal agreed with Dr. Jones that Deere could not "rationally" assist in his defense in 1982 because of his "compulsion to be punished with the death penalty" and self-destructive personality.[6]

The district court (Judge Gary Taylor) denied Deere's habeas petition, and did so without holding an evidentiary hearing. The court held that the state trial court's finding that Deere was competent was presumed correct and was supported by the record. The court reasoned that the attorneys, mental health experts and trial judge all found Deere competent; Dr. Bolger's 1982 conclusions were consistent with the 1982 report of Dr. Jones; the crimes did not show incompetence; and Deere's behavior in 1982 and 1986 did not provide any evidence of incompetence. Judge Taylor concluded that there was no evidence before the trial court to require a competence hearing.

The district court held that the newly-obtained mental health opinions, made 10 years after trial, could be considered, but that those opinions did not compel the rejection of the finding of Deere's competence. Both Drs. Jones and Rosenthal based their opinions on what they deemed to be Deere's unreasonable decision not to put on a defense. However, they agreed that Deere was competent in the sense that he understood the nature of the proceedings. The fact that Deere desired an *outcome* that the doctors

---

[6] Dr. Rosenthal did not testify about this 1993 report at the evidentiary hearing before Judge Snyder because he could not remember it. Dr. Rosenthal also testified that he could not "answer the question of whether Mr. Deere was competent."

believed to be irrational, Judge Taylor reasoned, did not make Deere incompetent to plead guilty.

In his habeas petition, Deere also claimed that he was denied due process because, he said, Judge Metheny was himself not mentally competent in 1986. Deere sought discovery and an evidentiary hearing on this point. The district court denied this claim, reasoning that the record as a whole did not show any evidence that Judge Metheny was incompetent, and none of the attorneys, not Mr. Jones, not Mr. Landau, not the prosecutor, who were in the best position to assess competence, ever moved to recuse the judge. Although Judge Metheny may have made an initial misstep when confronted with Mr. Jones's refusal to present mitigation after the case had been remanded for exactly that purpose, any error was understandable given the novel nature of the circumstances. This did not show mental incompetence.[7]

---

[7] The district court also rejected a sufficiency of the evidence claim for the first degree murder conviction and related ineffective assistance of counsel claim because Deere:

> walked a great distance with the murder weapon, broke into the house to wait for Donald Davis to return, had considered the consequences for the homicide on a prior occasion, had threatened to kill the whole family, and had told others that he was going to do something. . . .

Similarly, the district court held that counsel was not ineffective for not presenting mental state evidence because Deere was competent, adamantly opposed the evidence, refused to consider a plea of guilty by reason of insanity or mental health defenses and insisted on pleading guilty and seeking the death penalty against defense counsel's advice. As Mr. Jones advised the court, he had an ethical duty to follow Deere's

The district court denied the habeas petition in its entirety and Deere appealed. In 2003, the first time this case was before us, we remanded it for an evidentiary hearing on the question of Deere's competency to plead guilty and the claims premised on that issue. We wrote that:

> [W]e agree with Deere that he came forward with sufficient evidence at least to trigger a hearing on whether he was, in fact, competent to have pleaded guilty. We do not quarrel with the district court's statement that Dr. Rosenthal's "conclusions cannot be awarded as much weight as that given to Dr. Jones' examination which occurred around the time of the trial." Belated opinions of mental health experts are of dubious probative value and therefore, disfavored. *See Williams*, 306 F.3d at 706. ("[W]e disfavor retrospective determinations of incompetence, and give considerable weight to the lack of contemporaneous evidence of a petitioner's incompetence to stand trial.") (citation omitted).

> Dr. Jones's declaration, however, stands on different footing. It is based on his two examinations of Deere, which he performed in 1982, within several days of when Deere pleaded guilty. It is, therefore, probative of Deere's mental status at the critical time. Dr. Jones also offered a reasonable explanation for why he did not render an opinion on

wishes.

Deere's competency right then and there: He was told by Lawyer Jones not to. Viewed together, the declarations of Drs. Jones and Rosenthal "create a real and substantial doubt" as to Deere's competency to plead guilty, if they are taken at face value and assumed to be true.

We express no opinion on how the district court should weigh the evidence after hearing it. We simply hold that a hearing was required. We remand to the district court with directions to hold a hearing on Deere's claim that he was incompetent to plead guilty, and to reconsider the petition for writ of habeas corpus as to the claims premised on that contention. This court will rule on the other issues raised in petitioner's appeal if and when the case is re-appealed.

*Deere*, 339 F.3d at 1086–87.

Judge Snyder took over the case from Judge Taylor and conducted an evidentiary hearing in 2007. *Deere v. Cullen*, 713 F. Supp. 2d 1011, 1015 (C.D. Cal. 2010).

At the evidentiary hearing, Dr. Jones testified that he examined and tested Deere for a total of two hours in 1982. His 1982 diagnosis of borderline personality disorder was supported by Deere's self-mutilation and suicidal behavior. That same self-destructive behavior motivated Deere to seek the death penalty and waive presentation of mitigating evidence. Dr. Jones opined that Deere "[knew] what was going on around him so that he understood the nature of the

criminal proceedings" in 1982. But, Dr. Jones opined, Deere was "unable to assist counsel in the conduct of a defense in a rational manner" in 1982. In other words, Deere was "strongly motivated" to seek the death penalty by his self-destructive needs.

Dr. Jones testified he "had reservations about" Deere's competence in 1982 because of Deere's "self-destructive behavior." But, Dr. Jones did not "arrive at . . . an opinion with respect to Deere's competency" in 1982. Dr. Jones testified that he advised Mr. Jones in 1982 that Deere's decision to plead guilty was a continuation of his impulsive lifestyle. However, Dr. Jones stated in his deposition that he could not remember if he advised Mr. Jones in 1982 that Deere might not be competent.

Armando Favazza, M.D., testified that habeas counsel hired him in 2004, 22 years after the guilty plea, to assess Deere based on the records. Dr. Favazza never met with or tested Deere, but nevertheless opined at the evidentiary hearing that he would not have diagnosed the borderline personality disorder (the diagnosis made by both Dr. Bolger and Dr. Jones). Instead, he would have diagnosed mild to severe depression. Alcohol abuse, he opined, makes it difficult to diagnose personality disorders. According to Dr. Favazza, Deere had "a pathological fixed idea that he must be killed." This "fixed idea" "prevented [Deere] from cooperating with his counsel." Dr. Favazza admitted, though, that the Diagnostic and Statistical Manual IV, commonly known as the DSM IV, does not *recognize* a mental illness of "fixed" or "pathological" death wish.

Dr. Rosenthal testified that he had been hired to evaluate *Dr. Bolger's* qualifications and procedures. Based on Dr.

Bolger's two reports, his 1986 testimony and a 1986 deposition, Dr. Rosenthal testified he didn't think Dr. Bolger had formally trained or was otherwise well-trained in psychiatry. Dr. Rosenthal stated, "[Dr. Bolger] did claim to be board certified in one of his transcripts which I find very troubling because the letter in the files that I was provided from the board, the American Board of Psychiatry indicating that Dr. Bolger had never been certified by that board."[8] Therefore, he did not believe that Dr. Bolger's report could be reliable.

Dr. Pablo Stewart, a psychiatrist who had never met or tested Deere, was hired by habeas counsel in 2006, 24 years after Deere pled guilty. He opined that Deere suffered from post-traumatic stress disorder (PTSD) and possibly organic brain syndrome. Dr. Stewart acknowledged that the same symptoms used to diagnose PTSD can establish a borderline personality disorder. It was unclear, Dr. Stewart testified, whether Deere had a major depressive disorder. Dr. Stewart opined that Deere's plea was "colored by" his "psychiatric condition." In other words, Deere's mental health "inhibited" his ability to think rationally.

The state's expert, Park Dietz, M.D., Ph.D., did not meet with or examine Deere, but not because he didn't try. The parties stipulated, and Judge Snyder ordered, that Dr. Dietz would examine Deere at the prison, but Deere refused to cooperate. Dr. Dietz has been a board-certified psychiatrist since 1979. He specializes in forensic psychiatry. Dr. Dietz agreed with both Drs. Jones and Bolger that Deere had borderline and anti-social personality disorders. The borderline personality disorder diagnosis was supported by

---

[8] *See* Note 1, *supra*.

Deere's history of cutting himself; pattern of unstable personal relationship; marked impulsivity; frantic efforts to avoid real or imagined abandonment; unstable self-image; substance abuse; self-mutilation; emotional instability and inappropriate, intense anger. The anti-social personality disorder was similarly supported by the record. Anti-social personality disorder, which previously would have labeled Deere a sociopath, is not a psychotic state.

Dr. Dietz concluded that the 1982 and 1986 observations of Dr. Jones, defense counsel and Dr. Bolger established that Deere was competent to plead guilty in 1982. Specifically, Dr. Dietz opined:

> [Deere's] decisions were not made once, without thinking, in an impulsive manner. They were repeatedly and consistently made over a period of time where he heard alternative view points, was educated about his options, had someone making an effort to persuade him to take a different course of action, and during which Mr. Deere himself articulated his reasons for acting as he was wishing. And articulated his personal values and beliefs that were the basis for his decision. That's not impulsivity and that's not even the way borderline personalities make their decision when they're being symptomatic.

Dr. Dietz stated that the "idea of execution or death is undesirable" to most people. But he added:

> In Mr. Deere's case, he indicated that he had other values and goals that in his eyes made it self-serving for him to seek and even desire that he be executed. And those included his expressed desire to demonstrate his humanity, his expressed sense of justice, his expressed desire to spare further pain to his family and to his victims' family. And his expressed desire to accept responsibility for his crimes.

> If we credit him with the ability to hold those values and to espouse those goals and to care more for living in those ways in the brief span until execution, than for the value of life itself, then we would have to say that in his case he is asserting his goals in the service of himself that to him outweigh the obvious self-destructive function of permitting oneself to be executed.

Dr. Dietz said that "self-harm syndrome" or life-long death wish diagnosis is not a diagnosis recognized by the American Psychiatric Association or listed in the DSM IV. In any case, Dr. Dietz said that the same symptoms support the borderline personality disorder diagnosed by Drs. Jones and Bolger.

Dr. Dietz disagreed with Dr. Jones's 1993 opinion that Deere had an "irrational compulsion" to seek the death penalty. Dr. Dietz opined that even repeated suicide attempts do not warrant a diagnosis of a "compulsion" as the term is used in psychiatry. He said that the evidence in this case did not rise to the level of a compulsion.

After the evidentiary hearing, the court found that there was "no conclusive understanding of the nature and degree of [Deere's] mental illness."   It then offered Deere an opportunity to provide additional evidence to establish that a mental illness prevented him from assisting in his defense. Although the parties agreed that two experts, Drs. Stewart and Dietz, would jointly examine Deere, Deere again refused to cooperate.   Therefore, the court ruled without the additional evidence. *Deere*, 713 F.Supp. 2d at 1015–16.

The district court granted the habeas petition on the grounds of ineffective assistance of counsel.  The court held that Mr. Jones had performed below the objective standard of reasonableness in failing to request a full-blown competency hearing before Deere pled guilty. *Id.* at 1029–30.  Further, it also held that Deere was prejudiced by this failing because there was a reasonable probability that he would have been found incompetent had Mr. Jones adequately developed the issue at the time of Deere's guilty plea. *Id.* at 1041. Notably, having decided the case on this basis, the court specifically declined to "reach Deere's claim of actual incompetence." *Id.*

In coming to this conclusion, the court rejected Dr. Bolger's 1982 opinions, finding that "Dr. Bolger had no formal psychiatric training whatsoever,[9] misrepresented to the Court that he was board certified, and failed to disclose" that he "had a prior relationship with Deere's father as his treating physician and had previously interviewed Deere in that

---

[9] This finding is dubious because it is based on Dr. Rosenthal's speculation about Dr. Bolger's training.  The record simply does not contain details about the training beyond the fact that he trained and then was officially designated a psychiatrist in the California prison system.

capacity."[10] *Id.* at 1023, 1034. The court gave "substantial weight" to Dr. Jones's 1992 opinion, but also considered the expert opinions of Drs. Favazza, Stewart and Dietz. *Id.* at 1036.

The district court vacated Deere's convictions and sentences, *id.* at 1043, but stayed the order pending appeal. The state timely appealed.

## II. Jurisdiction and Standards of Review

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the district court's grant or denial of the habeas claims, the ineffective assistance of counsel claims and competence claims de novo. We review a district court's findings of fact for clear error and the district court's refusal to hold an evidentiary hearing for an abuse of discretion. *Williams v. Woodford*, 384 F.3d 567, 586, 608 (9th Cir. 2004).

State court findings of fact, including findings made by appellate courts based on reviews of the record, are entitled to a presumption of correctness and are reviewed for clear error. 28 U.S.C. § 2254(d)(8) (1996); *Sumner v. Mata*, 449 U.S. 539, 545–47, 550 (1981); *Jeffries v. Blodgett*, 5 F.3d 1180, 1187 (9th Cir. 1993).

---

[10] Specifically, Dr. Bolger had treated Deere's father for seizures at the Blythe hospital in 1981 and had taken a family history about the father's alcoholism from Deere. Dr. Bolger's prior experience with the Deeres is not mentioned in his 1982 reports. In 1986, Bolger denied knowing Deere previously, but is not clear why Dr. Bolger should have been expected to remember in 1986 that he had met Deere five years earlier, before the events of this case, while treating his father.

The Antiterrorism and Effective Death Penalty Act does not apply to this habeas petition because the original petition was filed in 1993. *Williams*, 384 F.3d at 586. Thus, we grant habeas relief if Deere proves by a preponderance of the evidence that he "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (1996).

## III.     Deere's competence to plea guilty and stand trial and related ineffective assistance of counsel claim

Many of Deere's claims revolve around his competence during the 1982 and 1986 proceedings. Deere was competent to plead guilty and stand trial if he had "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Godinez v. Moran*, 509 U.S. 389, 396–98 (1993); *Drope v. Missouri*, 420 U.S. 162, 172 (1975); *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam).[11] Competence "has a modest aim: It seeks to ensure that [the defendant] has the capacity to understand the proceedings and to assist counsel." *Godinez*, 509 at 402.

The state courts' repeated findings that Deere was competent to plead guilty and stand trial in 1982 and 1986 are presumed to be correct if they are fairly supported by the record. *Demosthenes v. Baal*, 495 U.S. 731, 735 (1990); *Maggio v. Fulford*, 462 U.S. 111, 116–17 (1983) (per curiam); *Evans*, 800 F.2d at 887. No formal evidentiary

---

[11] When Deere pled guilty in 1982, California applied the same competence standard. Cal. Penal Code § 1367 (1982); *Deere*, 710 P.2d at 927; *People v. Jablonski*, 126 P.3d 938, 961 (Cal. 2006).

hearing is required for the presumption to apply. *Mata*, 449 U.S. at 545–46. Deere must come forward with clear and convincing evidence to rebut the presumption. *Id.* at 550.

The question on this aspect of the case boils down to this: whether Deere suffered any prejudice from the lack of a competency hearing, even assuming for the sake of argument that Mr. Jones should have moved for one? Put another way, was there a reasonable probability that he would have been found incompetent to plead guilty? *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *Stanley v. Cullen*, 633 F.3d 852, 862 (9th Cir. 2011). We review this question on a de novo basis. *Williams*, 384 F.3d at 586. After carefully reviewing the record, including the district court's factual findings that we accept as true, we hold that there is no reasonable probability that Deere *would have* been found incompetent to enter his plea.

Furthermore, the state court's finding that Deere was in fact competent is presumed correct and has not been rebutted by clear and convincing evidence. *Evans*, 800 F.2d at 887. First, *all* of the mental health experts, even the Johnny-come-latelies, agree that Deere had the ability to understand and actually understood the nature and object of the proceedings against him.[12] The reports of *both* mental health experts who examined Deere in 1982 establish that Deere understood the proceedings and was able to cooperate with counsel. The reports of Drs. Bolger and Jones are remarkable for the

---

[12] As the Supreme Court explained in *Godinez*, competence requires only the *ability* to rationally understand. In contrast, the plea is knowing if the defendant *actually understands* the proceedings. *Godinez*, 509 U.S. at 401 n.12. Thus, the expert opinions that Deere understood the proceedings also demonstrate that Deere's plea was knowing.

similarity of their conclusions. Both doctors opined that Deere understood the proceedings, was oriented to time, place and person and was free of thought disorders. Both experts diagnosed Deere with substance abuse and personality disorders with antisocial aspects. Dr. Jones also diagnosed adjustment disorder. No mental health expert has ever found Deere to be delusional, paranoid or psychotic. Dr. Bolger also opined that Deere was capable of working with counsel if it benefitted him to do so.

In 2010, Judge Snyder found that Dr. Bolger, who had died 23 years earlier and was no longer around to defend himself, was not a competent psychiatrist. Never mind that Bolger trained in psychiatry at a state hospital for several years, was the staff psychiatrist at a state prison for several years more and had a private psychiatric practice after that. Even if the court's finding about Dr. Bolger is entitled to deference, it is of little moment since Bolger's 1982 opinions were in almost complete lockstep with Dr. Jones's 1982 opinions and entirely consistent with the observations of the judge and counsel. And those observations come down to this: Deere knew what he was doing and had rational reasons for doing it.

Second, Judge Metheny personally interacted with Deere on numerous occasions at every hearing and repeatedly found that Deere understood the proceedings and could cooperate with counsel in a defense. During these interactions, Deere was lucid, appropriately answered open-ended questions, and established his understanding of the proceedings and his ability to consult with counsel. To repeat, the state court's finding that Deere was competent is not only strongly supported by the evidence, but presumed correct because "competency determinations necessarily involve assessments

of credibility and demeanor" by the trial judge, and "competency may be examined in open court on a full record." *Evans*, 800 F.2d at 887. Judge Metheny repeatedly observed and evaluated Deere's competence in 1982 and 1986. His observation that Deere was competent is presumed correct and strongly supported by the record. *Id.*; *Maggio*, 462 U.S. at 117–18. It certainly has not been rebutted by clear and convincing evidence.

Third, defense counsel, who spent a great deal of time discussing the issues with Deere, had no doubt that Deere was legally competent, rational and could cooperate in his defense if he wanted to. Although's Deere's psychiatric diagnosis is a medical question, his competence to plead guilty is a legal one that judges and lawyers deal with all the time. Deere and Mr. Jones conferred for countless hours before the plea was entered. It was apparent to Mr. Jones that Deere understood the proceedings and his various options but wanted to plead guilty for the reasons already stated: he wanted to spare his family; he wanted to minimize the trauma to the survivors; and he thought a guilty plea and possible death sentence was just under the circumstances. These are not irrational considerations. Mr. Jones was uniquely positioned to assess Deere's ability to understand the proceedings and his legal options. *Medina v. California*, 505 U.S. 437, 450 (1992); *Williams*, 384 F.3d at 606. Thus, Mr. Jones's opinion is "especially relevant" and provides "significant evidence" that Deere was competent. *Williams*, 384 F.3d at 608.

Fourth, the prosecutor believed that Deere was competent in 1982 and 1986.

Fifth, the facts of the crimes do not suggest legal incompetence or someone out of touch with reality. Deere

repeatedly threatened to kill Cindy's family. Then, after she left him, he planned the murder for a few days, again warned Cindy and then carried out that murder.

Sixth, the transcripts of the guilty plea proceedings establish that Deere actually understood what was going on. Deere accurately answered open-ended questions from the judge, consulted with his counsel in court and demonstrated his understanding of the proceedings, his waivers and the possible results of his actions. He was articulate, repentant and logical in the courtroom. Deere's "comprehension of the legal significance" of his actions, including the withdrawal of his not guilty plea, "indicated that he had the ability to consult with his attorney with a reasonable degree of rational understanding." *Williams*, 384 F.3d at 605.

Finally, as noted already, Deere had rational reasons for pleading guilty. As the California Supreme Court found, Deere "felt great remorse for his offenses and was prepared to suffer the consequences of a judgment of death." *Deere*, 710 P.2d at 927.

Eleven years after Deere pled guilty, habeas counsel came forward with newly-obtained opinions to the effect that Deere's plea was motivated by an irrational desire to be put to death, rendering him incompetent and his plea invalid, whether or not he understood his situation and the ramifications of his decision. This evidence is of little consequence for two reasons:

First, as we pointed out in *Deere I*, "[b]elated opinions of mental health experts are of dubious probative value and therefore disfavored." 339 F.3d at 1086.

Second, even if these belated opinions are credited, what matters is not whether Deere had a mental illness that affected his decision, but whether he had a mental illness that affected his capacity to understand his situation and make rational choices. *Dennis v. Budge*, 378 F.3d 880 (9th Cir. 2004), involves a case with strikingly similar facts. Dennis pled guilty to capital murder and was sentenced to death. He sought and was granted leave to withdraw his state habeas appeal. *Id.* at 882–83. A "next friend" federal habeas petition was filed arguing that Dennis was incompetent to have made these decisions due to mental illness. *Id.* at 886–87. A psychiatrist opined that Dennis "killed the victim and is seeking the death penalty as a convenient way out of life, and a way of assuring himself that ultimately he will die." *Id.* at 883. Nevertheless, the psychiatrist opined that Dennis had sufficient understanding of the proceedings to consult with counsel and had a rational and factual understanding of the proceedings. He was fully aware of the charges, the implications of the sentence, and the legal options available to him. *Id.* We held:

> The question . . . is not whether mental illness substantially affects a *decision*, but whether a mental disease, disorder or defect substantially affects the prisoner's *capacity* to appreciate his options and make a rational choice among them . . . A "rational choice" does not mean a sensible decision, or a decision that the next friend regards as reasonable.

*Id.* at 890 (emphasis in original).

Thus, because it is undisputed that Deere was fully aware of his situation and had rational reasons for his desire to plead guilty – in other words, that he had "the capacity to appreciate his options and make a rational choice" – it is not reasonably probable that he would have been found incompetent to plead guilty under the proper legal standard, even if his new-found experts had opined at a competency hearing in 1982 as they do now. We reverse Judge Snyder's order granting a writ of habeas corpus on this ground.[13]

We now turn to the order issued by Judge Taylor denying habeas relief on the other grounds raised by Deere.

---

[13] Deere's claim that the trial judge should have *sua sponte* held a competency hearing in 1982 fails because there was no evidence of his incompetence before the trial judge. Judge Metheny, the prosecutor and Mr. Jones all believed that Deere was competent. Deere's actions in court established that he understood the charges, understood the possible sentences, had extensively discussed his case with counsel, could state a factual basis for the plea, understood the rights he was waiving and could consult with counsel. He also gave rational reasons for pleading guilty and waiving a jury trial and his constitutional rights. Finally, the court-appointed psychiatrist found Deere competent, and both counsel stipulated to that competence finding. The trial court was entitled to rely on the competency determination. *Wallace v. Stewart*, 184 F.3d 1112, 1118 (9th Cir. 1999). The record before the trial judge simply did not raise a bona fide doubt about Deere's competence to warrant a *sua sponte* hearing.

Deere's claim that he was actually incompetent to plead guilty and stand trial fails because the state court's multiple, repeated competence findings are well-supported by the record. The new evidence, which we disfavor, simply does not provide the clear and convincing evidence necessary to overcome all of the evidence establishing that Deere was competent in 1982 and 1986.

## IV.    Trial judge's mental competency in 1986

Deere argues that the district court abused its discretion by denying his request for discovery and an evidentiary hearing on his claim that counsel was ineffective for not challenging Judge Metheny's competency to preside at the 1986 penalty retrial. We review the district court's denial of an evidentiary hearing for an abuse of discretion. *Williams*, 384 F.3d at 586. The district court must conduct an evidentiary hearing if the facts are disputed, the facts alleged would entitle the petitioner to habeas relief, if true, and if the petitioner did not receive a full and fair opportunity to develop the facts in state court. *Id.*

We hold that the district court did not abuse its discretion in finding that Deere did not come forward with sufficient evidence to warrant an evidentiary hearing on this issue.

The essence of Deere's claim is that in 1986, Judge Metheny was senile and that Mr. Jones rendered ineffective assistance of counsel in failing to attempt to disqualify him. Deere's habeas counsel admit that they did not have enough proof to sustain this claim, but they argue they came forward with enough to entitle them to discovery and an evidentiary hearing. They offered the following:

1. After the case was remanded by the California Supreme Court for the presentation of mitigating evidence, and after Mr. Jones still refused at Deere's insistence to offer mitigation, Judge Metheny held Mr. Jones in contempt and reimposed the death sentence. He then purported to "stay" the sentence and appointed a private investigator to develop mitigation. Mr. Jones objected to this, and ultimately the California Supreme Court struck the order and returned the

case to the trial court for the presentation of mitigating evidence.[14] When the case went back to Judge Metheny, he appointed Mr. Landau as a friend of the court and mitigation was developed and presented. Deere argues that Judge Metheny's ruling is evidence of not just legal error, but mental impairment.

2. Deere also points to certain statements Judge Metheny made at the time of sentencing as indicative of mental impairment. Deere argues that Judge Metheny "employed bizarre reasoning" by comparing Deere's murders to mafia hits,[15] soldiers shooting enemies during the war and individuals shooting judges.[16] The judge also compared Deere

---

[14] *Deere*, 808 P.2d at 1187 n.4.

[15] Judge Metheny stated:

> You might say what was committed here certainly was not an extensive crime. It had to do with an emotional situation. It has to do with the murder of people knowing one another. You can't compare it with organized crime . . . where somebody was hired to go out and shoot people. . .

[16]     THE COURT: . . .Can you think of anything sadder you could do to a mother or father – a mother in this case. Losing a husband and two kids?

THE DEFENDANT: No.

THE COURT: Me either. I've thought about that. I've thought about it a lot. When you go out and shoot somebody with a rifle – when you're in the service, it doesn't hurt you too much because you're told that is right. But stripping away the life of children and a husband from somebody that wasn't directly connected

to himself, noting that he was angry when he lost a girlfriend during the war.

3.  Deere also furnished declarations from four lawyers. Taylor Huff signed a declaration in 1993. He is a former public defender in Indio. He furnished a copy of a ruling Judge Metheny made in 1985 on a motion to suppress that Huff offered as proof of the judge's mental impairment. However, there is no explanation of how the ruling evidenced mental impairment or even in what way it was wrong. Huff expressed his opinion that Judge Metheny had difficulty grasping the legal concepts involved in that case, but provided no details. Huff also offered his opinion that Judge Metheny's faculties seemed to have deteriorated over the years. Huff declared that he had appeared before Judge Metheny five to ten times, but never sought his disqualification.

Michael Kennedy, a public defender in San Bernardino County, furnished a declaration in 1993 stating that he had heard "rumors" as early as 1985 that the judge had Alzheimer's Disease. Kenney states that in 1988 – two years *after* Deere was resentenced – he saw Judge Metheny, a former college football player, come down from the bench after an evidentiary objection, assume a football stance and challenge him. Kennedy speculates that Judge Metheny was having a flashback to his days as a college football player. After Kennedy moved for Judge Metheny's disqualification, Metheny "appeared to snap back into the present" and

---

to you, that puts that into the aggravating circumstances to the extent that everything else I say is a bunch of nonsense. If you shot the Judge, it might have been different.

apologetically disqualified himself. Kennedy had never appeared before Judge Metheny prior to 1988.

Mark Sullivan declared in 1993 that in 1984 Judge Metheny made "strange rulings and off-hand remarks" in a civil case. In 1986, Judge Metheny was presiding over a small claims appeal that was only supposed to have taken a couple of hours. When it dragged on for three days, Judge Metheny, apparently exasperated, came down from the bench, said that both sides were good Christian people, that they should settle the dispute, and then he dismissed the case. The matter was reinstated by the presiding judge. Sullivan stated that in his opinion, Judge Metheny was not competent to handle the responsibilities of a judge since 1983.

Finally, Diane Samuelson, one of Deere's current habeas counsel, furnished a declaration stating that in 1993 – seven years after Deere's sentencing – she unsuccessfully attempted to contact Judge Metheny. Ultimately, she received a phone call from someone who identified herself as his wife who told Samuelson that the judge was ill, couldn't remember cases anyway, and had an Alzheimer's-type condition.

As noted above, the district court denied the request for discovery without prejudice,[17] balancing this new evidence against the fact that neither Mr. Jones nor Mr. Landau ever moved to recuse and the fact that the California Supreme Court reviewed the record and found that the trial judge was fair, objective and carefully weighed mitigating and

---

[17] Deere wanted to depose Judge Metheny, obtain his medical records and subpoena "any relevant records of complaints lodged with the Commission on Judicial Performance between 1982 and 1988 against" the judge.

aggravating factors at sentencing. Evidence obtained 11 years after the sentencing, the district court reasoned, would not establish the judge's competency in 1986. Although the request for discovery was denied without prejudice, the request was never renewed.

The district court also denied the request for an evidentiary hearing because the evidence proffered, when viewed along with "the entire record," did not support Deere's allegation that the judge was incompetent. None of the attorneys who actually appeared before Judge Metheny in this case – Mr. Jones, Mr. Landau, the prosecutor and appellate defense counsel – ever questioned the trial judge's mental competence. These lawyers, the district court added, were in the best position to observe the trial judge's behavior. In addition, although Judge Metheny may have initially erred in his handling of Mr. Jones's refusal to put on mitigation, the district court noted, "the fact that all the parties were breaking new ground in this case. . . It is rare that a defendant pleads guilty in a death penalty case, and Petitioner created a novel dilemma when he declined to present any mitigating evidence." Neither the judge nor parties had experience with the novel situation.

We hold that the district court did not abuse its discretion in denying an evidentiary hearing on the subject of Judge Metheny's mental competency in 1986. First, with respect to Judge Metheny's ruling when Mr. Jones refused to put on mitigation, a ruling later reversed, there is simply no evidence – none – that this ruling was other than legal error committed when the judge was confronted with a highly unusual situation. Mr. Jones refused to present mitigation in a capital case even after the case had been remanded by the California Supreme Court for that very purpose, even on pain of

contempt. Judge Metheny was sailing in unchartered waters. His procedure of reimposing the death penalty, and then staying it for further mitigation was error. After this error was corrected on appeal, the case was remanded to Judge Metheny and it proceeded to conclusion without further ado and it was affirmed on appeal. Legal error, especially in the context of highly unusual circumstances, is not evidence of senility.

The out-of-context excerpts of Judge Metheny's remarks at Deere's 1986 sentencing prove only that Judge Metheny was not the most articulate of men. However, when Judge Metheny's remarks are read in context and not in isolated snippets, it is apparent that he was trying to make the legitimate point that he could empathize with Deere about the pain of being jilted by a girlfriend. He was also explaining that he had to consider the facts of the crimes to determine the sentence. He was making the point that Deere committed an emotional crime, rather than a murder for hire. And that even though Deere was intoxicated and upset, he had nevertheless planned the murder; it was not an accident, like drunk driving, nor was it a spur-of-the-moment killing.[18]

---

[18] The dissent (but not Deere) argues that Judge Metheny exhibited "mental incompetence" at the penalty phase as evidenced by a discussion in which defense counsel requested that the judge rule that the aggravating evidence "outweighed" the mitigating evidence, all before any mitigating evidence was even presented. After Judge Metheny (and the prosecutor) expressed confusion about this request and sought clarification of what defense counsel was really seeking – basically, a ruling that the aggravating evidence was insufficient as a matter of law – Judge Metheny denied the request and required the presentation of mitigation, a ruling not disturbed on appeal.

Although Deere's *lawyers* argue that Judge Metheny's remarks are evidence of mental impairment, conspicuously missing from their submission is anything from any of their *doctors*. Despite having access to a veritable stable of mental health professionals who could have reviewed the transcripts – Dr. Jones, Dr. Rosenthal, Dr. Favazza, Dr. Stewart – not one has opined that Judge Metheny's statements are evidence of a disordered mind, or even that they warrant further inquiry.

The declarations of the lawyers recounting anecdotes also do not provide a basis for a hearing. Taylor Huff's declaration boils down to his personal opinion that Judge Metheny "had difficulty grasping" the legal concepts involved in a 1985 motion to suppress. Huff is certainly entitled to his opinion, but it is not proof of the judge's mental impairment, especially since there is no specific explanation of what the problem supposedly was. Judge Metheny's ruling attached to Huff's declaration is unremarkable on its face, and there is not even an allegation that it was ever found to be legally erroneous. Huff's declaration does not warrant a hearing.

Michael Kennedy's declaration speaks of "rumors" he'd heard about Judge Metheny around 1985. Rumors do not warrant a hearing. The football incident occurred in 1988 – two years *after* Deere's sentencing. At best, the football incident sheds light on Judge Metheny's status at *that* time, not in 1986. In fact, Kennedy says he never even appeared before Judge Metheny until 1988. His observations two years after the time in question do not warrant a hearing.

Mark Sullivan's declaration speaks of "strange rulings," not otherwise identified, made by Judge Metheny in a civil

case in 1984. It also recounts an inexplicable statement that the judge made to the jury to the effect that Sullivan's wife had complained to the judge about Sullivan's staying out too late at night. No transcript was furnished, so it is impossible to tell whether this statement was an attempt at humor, the product of confusion, or something else. In any event, this one stray remark, without any context in a 1984 trial, does not warrant a hearing. The 1986 event in which the judge abruptly dismissed a small claims appeal that was supposed to have taken just a few hours, but went on for three days, shows a judge who became exasperated and blew his stack. Although this is evidence of impatience, it is not hard to understand how or why the incident happened. Once again, Deere has failed to furnish *anything* from any of his several mental health experts ascribing any clinical significance to this incident.

The substance of Diana Samuelson's declaration quoting the woman who identified herself as Judge Metheny's wife in 1993 is hearsay. Even if it weren't, the woman's statements speak only to Judge Metheny's condition in February 1993, and say nothing about his status in 1986.

Deere's habeas counsel accuse Mr. Jones of ineffective assistance of counsel for failing to move to disqualify Judge Metheny, yet offer no evidence whatsoever that Huff, Kennedy or Sullivan ever shared their opinions of Judge Metheny with Mr. Jones or passed along the gossip and rumors they included in their declarations. In evaluating Mr. Jones, we look to what he knew in 1986. *Strickland*, 466 U.S. at 689.

Finally, and most importantly, on May 2, 1991, the California Supreme Court affirmed, without dissent, Judge

Metheny's handling of the 1986 proceeding – the proceeding Deere now argues was affected by the judge's mental impairments. Not only was Judge Metheny affirmed in toto, but the Supreme Court even specifically observed that "the record indicates that the trial court remained scrupulously fair and objective throughout the proceedings. It carefully weighed and considered both the aggravating and mitigating evidence after they were presented." *Deere*, 808 P.2d at 1195. Not only did the Supreme Court fail to express any concern over Judge Metheny's statements or behavior, it explicitly commended him on the way he handled the case. This alone compels the conclusion that Judge Metheny was not impaired when he presided over this case in 1986, and that Mr. Jones was not ineffective in failing to seek his disqualification.

The dissent says, "The majority holds that a judge suffering from dementia may sentence a man to death." We hold no such thing. What we really hold is that the anecdotes drummed up many years after the time in question do not support the claim that Judge Metheny was impaired in 1986, particularly in light of the California Supreme Court's laudatory affirmance of Judge Metheny's supposedly-impaired 1986 rulings.

## V. Conclusion

We REVERSE the district court's grant of the petition for writ of habeas corpus on the ineffective assistance of counsel claim relating to the lack of a competency hearing, AFFIRM

the district court's denial of the petition on all other grounds[19] and REMAND for the district court to deny the petition for writ of habeas corpus.

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**

W. FLETCHER, Circuit Judge, dissenting:

The majority holds that a judge suffering from dementia may sentence a man to death. I disagree.

A severely disturbed Ronnie Deere shot and killed Don Davis and Davis's two young daughters. Deeply remorseful, Deere convinced deputy public defender Glenn Jones to help him obtain a death sentence for his crimes. Deere pled guilty and waived a penalty-phase jury. Jones presented no mitigating evidence. Superior Court Judge Fred R. Metheny sentenced Deere to death in 1982. The California Supreme Court reversed and remanded, holding that a death sentence could not be imposed without the presentation of mitigating evidence. *People v. Deere* (*Deere I*), 710 P.2d 925 (Cal. 1985). On remand in 1986, Jones again refused to present mitigating evidence. Judge Metheny again sentenced Deere to death, even though he had been specifically instructed by the Supreme Court not to do so without hearing mitigating evidence. Judge Metheny held a second penalty hearing a few months later, at which another attorney presented

---

[19] The remaining claims Deere asserts on appeal were rejected by the district court. We affirm those rulings for the reasons set forth by Judges Taylor and Snyder, respectively.

mitigating evidence. At that hearing, Judge Metheny sentenced Deere to death for the third time. The California Supreme Court affirmed. *People v. Deere* (*Deere II*), 808 P.2d 1181 (Cal. 1991).

When Judge Metheny resentenced Deere to death in 1986, he was mentally incompetent. Three attorneys who appeared before Judge Metheny during this period provided affidavits in support of Deere's state and federal habeas petitions. The attorneys describe Judge Metheny as incompetent and report that his incompetence was general knowledge in the courthouse. The record of Deere's resentencing also shows Judge Metheny's incompetence.

I believe the evidence already in the record is sufficient to demonstrate that Judge Metheny was mentally incompetent when he resentenced Deere to death in 1986, but that is not the question before us today. The question now before us is much easier: Should the district court have granted an evidentiary hearing on Judge Metheny's mental competence? The majority holds that such a hearing was not required. I disagree.

It is an open secret that some judges stay on the bench too long. Formal procedures exist for removing senile judges, but they are rarely employed. Attorneys hesitate to challenge judges they appear before, and judges hesitate to blow the whistle on their colleagues. I am as reluctant as most judges to seek to remove a senile judge or to set aside a decision reached by such a judge. But when a man's life is at stake, I cannot stay silent.

## I. Procedural Background

Deere filed a federal habeas corpus petition in 1993, before the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Two federal district judges have dealt with his petition. District Judge Taylor denied Deere's petition in its entirety in 2001. On appeal from that denial, we wrote that Deere had "c[o]me forward with sufficient evidence at least to trigger a hearing on whether he was, in fact, competent to have pleaded guilty." *Deere v. Woodford*, 339 F.3d 1084, 1086 (9th Cir. 2003). We held that two declarations "'create[d] a real and substantial doubt' as to Deere's competency to plead guilty, if they [were] taken at face value and assumed to be true." *Id.* at 1087 (quoting *Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir. 1985). We remanded for a hearing "on Deere's claim that he was incompetent to plead guilty, and to reconsider the petition . . . as to the claims premised on that contention." *Id.* We did not reach any other issues, including Judge Metheny's competence in 1986.

District Judge Snyder conducted the hearing on remand. In a careful forty-nine-page order, she concluded that Jones provided ineffective assistance of counsel ("IAC"). She held that Jones fell below "an objective standard of reasonableness and performed below the professional standard in his community at the time" when he failed to investigate Deere's competence to plead guilty. She held that Deere was prejudiced because there was a "reasonable probability that, but for counsel's unprofessional errors," Deere would have been found incompetent.

The State appeals Judge Snyder's decision. Deere continues to appeal Judge Taylor's decision. The panel

majority reverses Judge Snyder's decision, affirms Judge Taylor's decision, and denies Deere's petition. I disagree with the majority on three issues.

First, I would hold that the district court should have granted an evidentiary hearing on whether Judge Metheny was mentally competent when he sentenced Deere to death in 1986. Second, I would hold that the district court should have granted an evidentiary hearing on whether Jones provided IAC in failing to challenge Judge Metheny's competence in 1986. Third, agreeing with Judge Snyder, I would hold that Jones provided ineffective assistance in failing to investigate Deere's competence to plead guilty in 1982.

## II.  Judge Metheny's Competence in 1986

### A.  Evidence of Incompetence

Judge Metheny first sentenced Deere to death in 1982. The California Supreme Court reversed the death sentence because Jones had refused to present mitigating evidence and Judge Metheny had imposed the sentence without requiring Jones to do so. *Deere I*, 710 P.2d at 934. The Court remanded for a new sentencing hearing, holding that a death sentence could not be imposed in the absence of mitigating evidence. *Id*.

Judge Metheny conducted two resentencing hearings after remand. At the first hearing, held on April 21, 1986, Jones again refused to present mitigating evidence. Judge Metheny did not require mitigating evidence and sentenced Deere to death the next day. On May 14, Judge Metheny "stayed" the new death sentence by minute order. Even though stayed, the

death sentence triggered an automatic appeal to the California Supreme Court. On June 9, the Court struck the judgment of death and "returned [the case] to the superior court for further proceedings."

On June 27, 1986, Judge Metheny appointed attorney Jonathan Landau to present mitigating evidence on Deere's behalf as a friend of the court. A second resentencing hearing was held on July 18, 1986, at which Landau presented mitigating evidence. Judge Metheny sentenced Deere to death the same day. The California Supreme Court affirmed. *Deere II*, 808 P.2d at 1195.

Evidence of Judge Metheny's mental incompetence in 1986 falls into two categories. First, three attorneys who appeared before him provided affidavits in which they attest to Judge Metheny's incompetence in 1986. Second, the record of Deere's 1986 resentencing, including but not limited to the transcripts, shows Judge Metheny's incompetence.

### 1. Attorneys' Affidavits

Three attorneys who appeared before Judge Metheny in the 1980s provided sworn affidavits in support of Deere's 1993 state habeas petition. Those affidavits were later provided to the district court in support of Deere's federal habeas petition.

Attorney Mark Sullivan wrote:

> I came to know Judge Fred Metheny in 1983 when he presided over a criminal case wherein I represented the defendant. That

experience left me unwilling to risk the liberty of another of my clients in his hands. I resolved never to permit him to be involved in another criminal case of mine.

. . . In a civil jury trial in 1984, *Ohlsson vs. Phillips*, opposing counsel and I found ourselves bewildered by many of Judge Metheny's strange rulings and off-hand remarks to the jury. For example, despite the fact that my wife and I had never had any personal relationship whatsoever with Judge Metheny, he told jurors in the case that my wife constantly complained to him that I stayed out too late at night. This was out of the blue and not connected to anything that had transpired.

. . . By 1986, the only matter of mine which I would agree to allow Judge Metheny to hear was *McCready vs. Moore*, a Superior Court trial *de novo* of a small claims action. This matter was supposed to last a couple of hours, but we were in our *third day* of testimony when Judge Metheny appeared to become very frustrated. He stepped down from the bench and started shaking hands with all of the litigants seated at counsel table. Opposing counsel and I just looked at one another in amazement. Judge Metheny then went into the spectator section of the courtroom where many observers had been seated and started shaking hands with them. He told them that he assumed all of the people

in his courtroom were Christians and attended church, and remarked upon our inability to settle the case. He then ordered the case dismissed. Opposing counsel and I reported this to the presiding judge, and Judge Noah Ned Jamin informed us that he would be retrying the case in its entirety, which is what he did.

. . . As the years passed, it seemed as if his condition worsened considerably. It appeared as if he would float in and out of reality. He would not recognize people whom he had known for years. It was a very sad situation, because I am told that he was once a very likeable man.

Attorney Taylor Huff wrote:

I have worked in the Indio [public defender's] office since approximately March of 1985. I appeared before Judge Fred Metheny between five and ten times from 1985 until his retirement in 1989, but did not conduct any criminal trials before him. . . .

I did have occasion to appear before Judge Metheny for pretrial motions. I recall one lengthy suppression hearing which was held in 1985 in the case of *People v. Dyer*. It became obvious to me during that hearing that the judge had difficulty grasping the legal concepts involved; and his written ruling . . . confirmed my opinion of his slipping grasp.

. . . I was aware of the penalty phase retrial ordered by the California Supreme Court in *People v. Deere*, as Mr. Deere was represented by Glenn Jones, another deputy in the Indio office.  I observed part of these proceedings.  In my opinion, it was not appropriate for this capital case to be reassigned to Judge Metheny; I do not believe he was then competent to sit in judgment of a capital case or other serious or complex criminal matters.

Attorney Michael Kennedy wrote:

I was a deputy district attorney in Indio, Palm Springs, and Blythe in 1983 and 1984 and entered private criminal defense practice in those areas in 1985.  I had heard of Superior Court Judge Fred Metheny's reputation among the local prosecution and defense bars as being unable to render appropriate judicial services as long ago as about 1984, while I was still a prosecutor.  I specifically recall my supervisor, then-Assistant District Attorney . . . Thomas Douglass, Jr., commenting on his anxiety about having complicated evidentiary issues heard by Judge Metheny in about 1984.  However, it was my impression that the D.A.'s office did not want to shunt cases away from Judge Metheny . . . because Judge Metheny's background as an F.B.I. agent (about which litigants were always regaled at

length by the judge) caused him to instinctually err on the side of the People. . . .

It was not until about 1988 that I had occasion to appear before Judge Metheny. . . . During those proceedings, . . . Judge Metheny came off the bench, following an evidentiary objection by me, assumed a three-point stance on the floor in the open courtroom, ordered me to get down on the floor opposite him (to the horror of the on-looking spectators, court personnel, and my client), and threatened to knock me all the way out into the parking lot. When I declined to "assume the position," the judge then got up and insisted that I accompany him to the parking lot so he could knock me around. He had, I believe, imagined he was back at Nebraska State, where he was a star football player in the '40's or thereabouts. That was one of his common regressions, witnessed by anyone foolish enough to take a case before him. . . .

I met with the presiding judge and the criminal calendar judge, who acknowledged the outrageousness of Judge Metheny's antics, and they requested that I not take the matter to the press or to the commission on judicial performance, given that it appeared that Judge Metheny would be retiring within several weeks. . . . I chastised these two judges for letting things get so far out of hand with a judge who they, and everyone, knew was not capable of handling the job, to the serious

detriment of those whose liberties hang in the
balance. They conceded it was a difficult
matter to deal with and appeared to regret that
things had gone on for so long. It seems that
the problem was that Judge Metheny was
always on the verge of retirement, for several
years, so no one wanted to hurt an otherwise
distinguished public servant in the twilight of
his career. But those promised, serially
impending retirements never materialized. . . .

. . . In my opinion, based on what I heard
and what I experienced, Judge Metheny was
not competent to handle any serious criminal
matter, much less a capital case, in 1986, nor
do I believe that anyone who knew of the
events of those days considered him
competent for some undefined time before
1986.

In November 1987, *The Press-Enterprise*, a local
newspaper of general circulation, rated judges on the
Riverside County Superior Court based on a survey of
lawyers and court staff. Judge Metheny was rated the
"worst" judge on the Riverside bench by a considerable
margin. The paper reported, "His detractors question his
intelligence and clarity of thought." The paper continued:

"He is in a complete fog," wrote one criminal
law attorney with six years in Superior Court.
"Doesn't know what's going on, can't make a
decision, only wants to talk about World War
II and playing football for Nebraska."

One respondent wrote that Judge Metheny "has simply been in the trenches too long"; another stated that Judge Metheny "appear[ed] to have little grasp of what's going on."

## 2. Record in Deere's 1986 Resentencing

Judge Metheny's mental incompetence was painfully obvious during Deere's 1986 resentencing. It may be seen in exchanges in the courtroom, and in particular instances of inappropriate behavior. I will give examples of both.

A lengthy exchange took place during the first of the two post-remand sentencing hearings, on April 21, 1986. The State's attorney, Robert Dunn, began the hearing by introducing transcripts and exhibits from the 1982 sentencing hearing. This evidence, in the State's view, showed aggravating circumstances warranting the death penalty. After submitting the evidence, Dunn said, "[A]nd the people would rest." Judge Metheny accepted the evidence and shortly thereafter stated, "You haven't rested yet." Dunn repeated, "And we're going to rest at this time."

Jones then moved for a ruling that the State's evidence was insufficient to support a finding of aggravation. Jones said, "I'm asking the Court to make a ruling that what Mr. Dunn has offered you does not justify a finding in aggravation." Jones had made the same motion at Deere's first sentencing hearing in 1982, and Judge Metheny had denied it. Now, however, Judge Metheny did not understand the motion. He responded:

> I don't think I'm in a position right now to grant the motion or deny the motion, either one. I think, assuming arguendo, that all the

evidence to be introduced by the District Attorney has been offered. If this were the end of it and this were the last shot, it would be a different position for me to view from than if I allow you to go ahead and produce all the evidence that is available and you feel is necessary and proper and supportive, then there's an opportunity that comes back again to the prosecution and their right to produce additional evidence.

Jones replied, "I don't disagree if the defendant offers evidence, but we haven't got to that stage yet." Judge Metheny then denied Jones's motion without prejudice.

Jones tried again:

Your Honor, with respect I would ask the Court to articulate the factual findings that permits the Court to come to the decision that there are sufficient aggravating circumstances at this point to justify a finding of aggravating circumstances.

Judge Metheny still did not understand:

Yes. Well, I think there's a conflict. If you could say it generally without doing two or three days of research on this matter, which may be necessary, but I hope not. I think we're still looking at this proposition. I'm looking at the case right now although this is the first time I've been through it. I haven't had an opportunity yet to review all the

evidence that was dumped in. I think it was dumped in for a good reason. It's in now. It's been allowed in. It's for me to review. The evidence as I recall it, and I haven't — and I have reviewed my files, what I think is available. I've come to the feeling that what we discussed first of all is that here is a matter, a case that had to do with more than one murder. I think we're talking about murders at the same time, but there were three murders in this particular case and that would be aggravating if it does apply. I haven't made up my mind on that because this is a new trial for aggravating and mitigating circumstances.

Another thing to take into consideration is murder involves particularly heinous, atrocious, and cruel actions. Now, I don't think that's going to come in on the evidence as far as that's concerned. It isn't in yet. You're asking me to do things ahead of time. That's just my comment on the side. I really don't have enough in my mind right now.

. . .

There is a possibility that we'll hear evidence to the effect that Mr. Deere was there and waiting, pursuing a victim while lying in wait. That's a possibility. But I don't see how you can ask me or force me now to state what you want me to state until you produce the evidence. I've got to make that

decision on evidence.  I can't make it out of
the wild blue yonder.

Do you understand my position, Mr.
Jones?

Jones tried once more:

Your Honor, in all due respect, I do not.
I apologize for saying that, but in the end
using an analogy, it's as if we are in a
criminal trial and the People have just rested
and the defendant is making a motion for
judgment upon insufficiency of evidence. We
are now in a penalty trial.  The People have
rested offering their aggravating evidence.
I'm making a motion on that evidence asking
the Court to make a finding of fact that their
aggravating evidence is insufficient, as a
matter of law, to support a finding of
aggravating circumstances.

Judge Metheny responded:

I will.  I will do that.  But if this were the
first time around and all this was put into
evidence right now and you asked me to make
your ruling right now I'd say, hey look, I
haven't had a chance to go over all this
evidence yet.   I don't have a memory,
although I guess I am probably quite a bit
smarter than most of the judges around here,
but I don't like to brag about it.  My memory
isn't that implicit.

Jones suggested a brief recess to review the evidence, and Judge Metheny said:

>    Say this was the way the case was handled the first time around. I'd say wait a minute. I want to go over every one of these exhibits and go over the transcripts and find out actually what happened. We didn't have a lot on it. We didn't have a lot of the transcript except final argument. We spent a bit of time there. If you give me another two hours or so I would feel much more comfortable. I don't want to make any more mistakes. I want to do it not for myself or for you but for justice. I can't tell you right now.

Jones again suggested a recess. Judge Metheny then recessed for lunch. Upon reconvening, Judge Metheny said:

>    I have done what I thought was absolutely necessary and that is to review the evidence and review the file again so that I'm caught up-to-date as to what has happened and what is happening.
>
>    Where were we? A motion?

After being reminded, Judge Metheny continued:

>    As I look at the situation at this point in time, if I were to balance the evidence which, of course, isn't the proper thing to do now, I would have to, based on the evidence, deny the motion.

Jones asked again for Judge Metheny to "articulate for the record what it finds in this case which justif[ies] a finding of aggravation. That's been my point all along." Judge Metheny neither gave the requested articulation nor provided a reason for not doing so.

After Judge Metheny denied his motion, Jones refused to provide evidence in mitigation. District Attorney Dunn then suggested that Judge Metheny hold Jones in contempt. Dunn emphasized to Judge Metheny that he was required to hear mitigating evidence before sentencing Deere, and that sentencing him without that evidence would be pointless. Judge Metheny did not hold Jones in contempt and did nothing else to secure the presentation of mitigating evidence.

The next day, without having heard any mitigating evidence, Judge Metheny sentenced Deere to death. After sentencing Deere, Judge Metheny informed him that he had sixty days to appeal. Jones reminded Judge Metheny that a death penalty appeal is automatic.

When Judge Metheny resentenced Deere to death in April 1986, he did not understand what the California Supreme Court had told him to do. In 1982, Jones had refused to present mitigating evidence, and Judge Metheny had sentenced Deere to death. In *Deere I*, the California Supreme Court reversed and remanded for resentencing, specifically holding that a death sentence could not be imposed without the presentation of mitigating evidence. On April 21, 1986, Jones refused to present mitigating evidence, just as he had done four years earlier. On April 22, Judge Metheny sentenced Deere to death without having heard mitigating evidence, just as he had done in 1982. That is, Judge

Metheny did precisely what the Supreme Court had unambiguously told him *not* to do.

Judge Metheny also behaved inappropriately during Deere's post-remand resentencing. Two examples illustrate this point.

First, Judge Metheny decided important issues without Jones or Deere being present. On May 14, 1986, Judge Metheny "stayed" Deere's April 22 death sentence and appointed an investigator to look for mitigating evidence. The minute order indicates that the prosecutor and Jones were present in the courtroom during proceedings leading to the entry of the order. The next day, Jones wrote a letter requesting that the minute order be changed to reflect the fact that he had not been present. There may, in fact, have been no open courtroom proceedings leading to the minute order. Despite extensive effort, no transcript for May 14 has been located. Judge Metheny may have decided, without notice or hearing, to stay Deere's death sentence and to appoint an investigator; or he may have held a hearing off the record without either Jones or Deere being present. Judge Metheny held another hearing a month and a half later, on June 27, 1986, at which he appointed Jonathan Landau to supervise the investigation, present mitigation evidence, and act as a friend-of-the-court at a new sentencing hearing. Judge Metheny also established various procedures, withdrew the order of contempt against Jones, and affirmed that Jones would continue representing Deere. Deere was not present in the courtroom, and there was no waiver of his presence.

Second, Judge Metheny made direct off-the-record contacts with witnesses. During the June 27 hearing at which Deere was not present, Judge Metheny stated, "But, as I

understand the situation, we have been mighty successful with Mr. Deere's family. I have contacted them directly and a number of other people who would be happy to testify the way Justice Mosk wants them to testify." Judge Metheny also appears to have contacted Deere's father at some point, for Judge Metheny stated during Deere's second resentencing, "I think Mr. Deere's father talked to him about it. I don't think Mr. Deere knows that I know as much as I do about this case."

There is direct evidence that Judge Metheny interviewed Deere's mother and two sisters in chambers off the record at the second penalty retrial. Deere's mother stated in a declaration presented to both the state and federal habeas courts:

> Me and my daughters Jeannie and Karen went to the second trial, the penalty trial I think they called it. . . . [W]e talked to the judge in his chambers. I can't remember if I testified. All I remember was going into the judge's chambers and him asking us if we thought Ronnie could be rehabilitated.

Deere's sister Jeannie DeLeon also remembered the incident. She stated in her declaration:

> After we testified, the judge asked us to go into his chambers to talk about Ronnie. He asked us a lot of things about Ronnie, about what kind of life Ronnie would lead if his sentence was overturned. It was real emotional back there.

### 3.  Majority's Response

The panel majority refuses to recognize the extent and strength of the evidence of Judge Metheny's mental incompetence.  According to the majority, the evidence "reveal[s] no more than eccentricity."  Op. at 6.

First, the majority focuses on a single sentence in the California Supreme Court's *Deere II* opinion that addresses Judge Metheny's consideration of the evidence.  The sentence upon which the majority relies is italicized in the block quotation that appears below.  In the view of the majority, this sentence is the "most important[]" factor.  "This alone compels the conclusion that Judge Metheny was not impaired[.]"  Op. at 62.  The majority takes the Court's sentence out of context.  The Court was responding to an argument that in 1986 Judge Metheny had not been impartial, and that the death sentence was therefore a "mockery."  The Court wrote:

> On the contrary, the record indicates that the trial court remained scrupulously fair and objective throughout the proceedings.  *It carefully weighed and considered both the aggravating and mitigating evidence after they were presented.*  Indeed, neither defense counsel nor Mr. Landau [who was appointed for the purpose of presenting mitigating evidence] challenged the impartiality of the trial court at any point during the proceedings.

*Deere II*, 808 P.2d at 1195.

As the full passage makes clear, the Court was not ruling on Judge Metheny's mental competence. Indeed, the issue of Judge Metheny's competence was never raised in the direct appeal to the Court. Instead, in the passage just quoted, the Court was ruling on Judge Metheny's impartiality. District Judge Taylor correctly understood the limited scope of the California Supreme Court's statement. He wrote:

> [The Court's] findings were made on claims that "the record [wa]s 'ambiguous' as to the standards which the trial court applied in determining the penalty, and thus that the sentence is constitutionally unreliable," and that the resentencing was a "mockery." [*Deere II*, 808 P.2d at 1194.] Thus, in terms of a claim of mental incompetency on the part of the trial judge, these factual findings do not preclude relief.

Second, the majority writes that Judge Metheny was sailing in "unchartered waters" when Jones refused to present mitigating evidence on April 21, and when Judge Metheny sentenced Deere to death the next day. Op. at 58–59. The majority writes, "[T]here is simply no evidence — none — that this ruling was other than legal error committed when the judge was confronted with a highly unusual situation." *Id.* at 58. The majority is wrong. The waters were hardly uncharted. What happened in April 1986 was a precise repeat of what had happened in 1982, and the legal issue in 1986 was the precise issue that the California Supreme Court decided in *Deere I*. The conclusion is inescapable that Judge Metheny's mental disability was so severe in April 1986 that he simply could not understand the Court's clear holding in *Deere I*.

Third, the majority contends that Judge Metheny's odd statements are merely "out-of-context excerpts." *Id*. at 59. The majority has inadvertently put its finger on part of the problem. Many of Judge Metheny's comments are indeed out of context. They are oddly irrelevant comments that come out of the blue. More important, the majority fails to take into account Judge Metheny's *in-context* remarks. The excerpts from the April 21 hearing, quoted at length above in order to provide context, show in excruciating detail the degree to which Judge Metheny was mentally impaired.

Fourth, the majority belittles the affidavits presented by attorneys Huff, Kennedy, and Sullivan. In the view of the majority, attorney Huff's "declaration boils down to his personal opinion." Op. at 60. Attorney Kennedy's "declaration speaks of 'rumors.'" *Id.* Attorney Sullivan's "declaration speaks of 'strange rulings,' not otherwise identified"; recounts an "inexplicable statement" without providing a transcript; and recounts an "event" in 1986 that "shows a judge who became exasperated and blew his stack." *Id.* at 60–61. I disagree. The affidavits of Huff, Kennedy, and Sullivan are serious assessments by serious professionals. Huff, Kennedy, and Sullivan practiced before Judge Metheny, directly observed the behavior they describe, and they knew Judge Metheny's reputation in the courthouse. All of them concluded that Judge Metheny was incompetent. These attorneys' affidavits are not casual, offhand, or unsupported evaluations. They are, instead, a terrifying window into Judge Metheny's courtroom.

Fifth, the majority faults Deere for not providing any medical evaluations of Judge Metheny's mental competence to serve as a judge in 1986. The majority writes, "Despite having access to a veritable stable of mental health

professionals who could have reviewed the transcripts — Dr. Jones, Dr. Rosenthal, Dr. Favazza, Dr. Stewart — not one has opined that Judge Metheny's statements are evidence of a disordered mind." Op. at 60. I do not fault Deere for not asking Drs. Jones, Rosenthal, Favazza and Stewart to evaluate Judge Metheny's mental competence. They were retained for the specific purpose of evaluating Deere's competence to plead guilty in 1982.

Moreover, because attorneys and judges are trained to understand legal rules and legal reasoning, they are in some respects better able than medical professionals to assess competence to serve as a judge. The question now before us is whether the district court should have allowed an investigation and evidentiary hearing concerning the mental competence of Judge Metheny. At some point, it may become necessary to have the evaluation of a developed record by medical professionals, but I emphatically do not believe such an evaluation is required at this stage.

## B.  Habeas Claims Related to Judge Metheny's Mental Competence

I would reverse two holdings of the district court related to Judge Metheny's mental competence. First, I would hold that the district court erred in refusing to grant an evidentiary hearing concerning Judge Metheny's competence. Second, I would hold that the district court erred in refusing to grant an evidentiary hearing on whether Jones committed IAC by failing to seek recusal of Judge Metheny based on his incompetence.

## 1. Evidentiary Hearing on Judge Metheny's Competence

The case law on due process violations resulting from mental incompetence of the decisionmaker is sparse but clear. The Supreme Court has stated unequivocally, "This Court has recognized that a defendant has a right to 'a tribunal both impartial *and mentally competent* to afford a hearing.'" *Tanner v. United States*, 483 U.S. 107, 126 (1987) (emphasis added) (quoting *Jordan v. Massachusetts*, 225 U.S. 167, 176 (1912)). In *Jordan*, the Court held that it would violate due process if an insane person were permitted to sit on a jury in a criminal case. *Jordan*, 225 U.S. at 176. The Court held that due process had not been violated only because the state court, after an evidentiary hearing, had concluded by a preponderance of the evidence that the juror in question was sane. *Id* at 173.

A federal habeas petitioner in a pre-AEDPA case is entitled to an evidentiary hearing if "(1) the petitioner's allegations, if proved, would entitle him to relief, and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts." *Williams v. Calderon*, 52 F.3d 1465, 1484 (9th Cir. 1995) (quoting *Hendricks v. Vasquez*, 974 F.2d 1099, 1103 (9th Cir. 1992)) (internal quotation marks omitted); *see also Stankewitz v. Woodford*, 365 F.3d 706, 714 (9th Cir. 2004). It is undisputed that Deere requested an evidentiary hearing on state habeas concerning Judge Metheny's competence and that his request was denied. Deere thus satisfied the second criterion, as the district court correctly held. The disputed question is whether Deere satisfied the first criterion.

Deere has alleged that Judge Metheny was so mentally impaired in 1986 that he was incompetent to preside over his capital sentencing. Because Deere waived a jury, Judge Metheny himself was required to decide whether Deere would live or die.

Deere has not only alleged facts that would entitle him to habeas relief. He has also provided substantial evidence in support of his allegations. The district court nonetheless denied Deere an evidentiary hearing. The district judge concluded, "Viewed as a whole, the trial judge's conduct and statements during the proceedings in 1982 and 1986 do not support Petitioner's allegations." (To be clear, I do not contend that Judge Metheny was incompetent in 1982. I contend only that he was incompetent in 1986.) The district court did not describe the attorneys' affidavits, nor any of the other evidence in the record, in explaining its conclusion. The district court concluded that Deere was not entitled to a hearing because the attorneys involved in the case failed to raise the issue of Judge Metheny's incompetence. The court wrote that attorneys Jones and Landau "were in the best position to observe the competency of the trial judge in 1982 and 1986." It wrote further, "[A]ppellate counsel and the prosecutor also appeared before the trial judge, and neither attorney ever made any kind of a record regarding the alleged incompetency of the trial judge."

Given the evidence in the record, the district court should not have attached controlling importance to the silence of the attorneys. Lawyers are loathe to challenge as incompetent the judge before whom they are appearing, and before whom they might appear again. In Deere's case, each of the attorneys had a particular reason not to challenge Judge Metheny. The two defense attorneys in the trial court were Jones and

Landau. Jones was actively trying to help Deere get a death sentence, and it was relatively clear that Judge Metheny would impose such a sentence. Landau was not Deere's attorney in the normal sense; he was retained as a friend of the court for the sole purpose of presenting mitigating evidence at the second resentencing hearing. Further, the prosecutor at trial was following office policy in not objecting to Judge Metheny. As recounted by attorney Kennedy in his affidavit, the prosecutor's office had a policy of keeping their cases before Judge Metheny, despite his incompetence, because he "instinctually err[ed] on the side of the People." Finally, an appellate lawyer, even if he had wanted to raise the issue of Judge Metheny's incompetence, would have known that the issue would be properly raised on collateral rather than direct review.

There was considerable evidence of Judge Metheny's incompetence that the district court declined to describe. I have summarized that evidence above. In my view, that evidence, if believed, is enough to support a determination that Judge Metheny was so mentally impaired he could not, consistent with due process, preside over Deere's resentencing in 1986. At a bare minimum, Deere was entitled on federal habeas corpus to a hearing on his claim that Judge Metheny was incompetent in 1986. At such a hearing, Deere would have been allowed to introduce additional evidence of Judge Metheny's incompetence. The State, of course, would have been allowed to introduce its own evidence, if any, and to cross-examine any of Deere's witnesses.

I realize that Judge Metheny has been dead for many years, and that it will be difficult to determine, more than 25 years after the fact, the precise degree of Judge Metheny's mental impairment in 1986. It would have been far

preferable to have had an evidentiary hearing in 1993, when the issue was first presented to the state and federal habeas courts. It would also have been preferable in 2003, when we remanded to the district court for a hearing concerning Deere's competence, to have remanded at the same time for a hearing concerning Judge Metheny's competence. Over my objection, the panel majority declined to add to our 2003 remand order a direction to conduct such a hearing.

I also realize that inquiries into the mental competence of judges pose difficulties. I am sympathetic to the concerns expressed by my colleague, then-Judge Kozinski, in his dissenting opinion in *Summerlin v. Stewart*, 267 F.3d 926, 957 (9th Cir. 2001) (Kozinski, J., dissenting), *opinion withdrawn*, *Summerlin v. Stewart*, 310 F.3d 1221 (9th Cir. 2002). In a perfect world, all judges would retire before their mental faculties deteriorate to the point where they are no longer competent to perform as judges. In that world, we would not be faced with the difficult problem of forcing, or encouraging, our colleagues to retire, or with the equally difficult problem of dealing with cases decided by judges who were, or might have been, incompetent.

But this is not a perfect world. Some judges stay on too long. They decide cases when they are no longer competent to do so. There is credible evidence of mental incompetence in the record before us. Deere has not embarked on a fishing expedition in which he hopes to find evidence of incompetence. He already has such evidence, a lot of it. There may be more evidence still to be found, but Deere has already presented enough to warrant a hearing.

I therefore conclude that the district court erred in refusing to hold an evidentiary hearing on whether Judge

Metheny was mentally competent when he sentenced Deere to death in 1986.

## 2. IAC for Failing to Seek Recusal of Judge Metheny

In his state habeas petition, Deere requested an evidentiary hearing on whether Jones committed IAC in failing to seek recusal of Judge Metheny. The state court denied the request. The district court on federal habeas also denied Deere's request for a hearing on Jones's alleged IAC in failing to seek recusal based on Judge Metheny's incompetence.

To establish IAC, Deere must show (1) that Jones's performance fell below an objective standard of reasonableness; and (2) that the performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). An attorney's performance is deficient when "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. There is a strong presumption that counsel's conduct falls within "the wide range of reasonable professional assistance." *Id.* at 689. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

If Jones had successfully moved in 1986 to recuse Judge Metheny based on incompetence, Judge Metheny would not have been permitted to resentence Deere. A due process violation based on a valid objection to a sitting judge is structural error such that reversal or vacation of the judge's order or judgment is automatic. *Tumey v. Ohio*, 273 U.S.

510, 535 (1927); *Greenway v. Schriro*, 653 F.3d 790, 805 (9th Cir. 2011) ("[W]hen a defendant's right to have his case tried by an impartial judge is compromised, there is structural error that requires automatic reversal."); s*ee also Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 883–84 (2009) (in a case of alleged judicial bias, a litigant need not demonstrate actual bias, but rather only a sufficient "risk" of bias).

Deere has presented substantial evidence that Judge Metheny was mentally incompetent in 1986 when he resentenced Deere to death. Deere had convinced Jones that he wanted to die. Jones and Deere struck a "deal" whereby Jones would do almost nothing to avoid the death penalty. I do not believe that such a deal — even if Deere had been competent to make it — permitted Jones, consistent with his duties as an attorney, to permit a violation of due process by allowing a mentally incompetent judge to decide whether his client should live or die.

A showing of prejudice under *Strickland* requires a showing that there is a "reasonable probability" that Jones would have succeeded in 1986 if he had moved to recuse Judge Metheny on grounds of incompetence. The evidence already in the record is more than sufficient to show that such a motion by Jones would have been successful. The affidavits of Huff, Kennedy, and Sullivan show that Judge Metheny was incompetent in 1986, and that his incompetence was widely known. More specifically, Sullivan's affidavit recounts that he and his opposing counsel went to the presiding judge in 1986 when Judge Metheny came down off the bench, shook hands with the spectators, commented on their Christianity, and dismissed the small civil case in the middle of trial. The presiding judge, well aware of Judge Metheny's mental state, promptly reassigned the case and

retried it himself. If the presiding judge was willing in 1986 to reassign this relatively inconsequential case because of Judge Metheny's incompetence, there can hardly be any doubt that he would have reassigned Deere's capital case if Jones had sought recusal.

I therefore conclude that the district court erred in refusing to hold an evidentiary hearing on whether Jones committed IAC in failing to seek recusal of Judge Metheny.

### III.  Deere's Competence in 1982

We remanded in 2003 for an evidentiary hearing on issues related to Deere's competence to plead guilty in 1982. After an extensive hearing, the district court concluded that Jones committed IAC in failing to challenge Deere's competence to plead guilty.

I agree with the district court that there is a reasonable probability that, had attorney Jones properly investigated, Deere would have been found incompetent to plead guilty.

### A.  Background

Deere was born in 1954. He is of Creek and Seminole heritage through his father. Deere was one of eight children in a very poor family. Deere's father was a violent alcoholic who abused his wife and beat his children until they bled. Deere's mother sometimes beat him. The family moved to Blythe, California, from Oklahoma so that Deere's parents could work as farm laborers. During his childhood, Deere was exposed to pesticides and pollutants in the nearby fields and in the drinking, irrigation, and swimming water.

Deere suffered three or perhaps four episodes of convulsions before he was one year old. He was placed in special education in the third grade because of attention and personality problems. At age ten, Deere had a full-scale I.Q. of 76, which placed him in the sixth percentile. When Deere was ten or eleven years old, he grabbed bare electrical wires and remained in contact with the current for several minutes. The shock adversely affected his coordination. Deere began cutting himself by age eleven. He began running away from home by age twelve. Deere dropped out of school in the eighth grade. He was committed to the California Youth Authority at age thirteen or fourteen.

Deere continued to cut himself in his adulthood, leaving long and deep scars all over his body. Deere repeatedly asked Alice Lyon, the mother of his first daughter, to kill him. Once, after he had seriously cut his hand, he asked police officers to let him die. On another occasion, when police found Deere bleeding from six-inch cuts on both arms and a smaller cut on his chest, Deere refused medical attention. Deere frequently came to the attention of local police for conduct including alcohol-related offenses, disturbing the peace, stealing a cow, and possessing a concealed weapon.

Deere had a tumultuous relationship with Cindy Gleason, the mother of his second daughter. In the six months before the murders, Deere's self-mutilation increased, and he drank a fifth of vodka each day. Cindy left Deere in January 1982, taking their baby to her mother's house. Deere began threatening Cindy and her family, including threatening to kill family members if Cindy left him and took the baby away permanently.

On January 12, 1982, Deere and Cindy met with social worker Virginia Erickson Tiernan. Tiernan noticed a seven- or eight-inch cut on Deere's arm. Deere told Tiernan that if he did not cut himself, he would hurt others. Tiernan was concerned that Deere was mentally ill and suggested that he go to the local mental-health center. An intake worker at the center diagnosed Deere with marital problems, alcohol abuse, and antisocial personality disorder.

In February 1982, Deere and Cindy briefly reconciled but again separated. Deere's self-mutilation and substance abuse increased, and he again began threatening Cindy and her family. In the two weeks before the murders, Cindy and her mother called Tiernan two or three times each night. Tiernan regularly asked the sheriff, probation department, and police for help, reporting Deere's threats against Cindy and her family.

On February 22, 1982, Cindy called Tiernan twice asking for help. Tiernan advised Cindy to get Deere "into mental health" and tried the next day to get Deere placed on a 72-hour psychiatric hold. On the advice of the probation department, Deere returned to the mental-health center on February 25, 1982. The intake worker noticed a cut on Deere's forearm, but noted that there was "no indication" of any "danger to self" and instructed Deere to keep his normal appointment for the next week.

On March 3, 1982, Cindy called the police to ask for help. Cindy's mother called the supervising psychologist at the mental-health center, who told Cindy's mother that he could not see Deere unless she and Cindy went through "the proper channels." Cindy called the probation department for help the next day, March 4, 1982. The probation department told

Cindy to call the same supervising psychologist. The supervising psychologist told Cindy to set up an appointment. On the afternoon of March 4, Cindy's former brother-in-law Don Davis picked up his two daughters, Cindy's nieces, for visitation. Witnesses reported seeing Deere that evening at a local market, drunk or in a daze. That night, Cindy and her sister drove to Davis's trailer and found the bodies of Davis and the two girls.

Five days later, police found Deere in the desert, missing his shirt and a shoe. Deere told the police he had been living on ditch water and raw birds. He had with him notes he had addressed to Cindy and his parents. Police found a .22 rifle with writing scratched into the wood stock: "if you have gone to doctor I got end the mean Ronnie I wish I understood — Kathy she help kill them now love her — Now live with it for life — you killed them to — Shorty [Cindy] you hurt like me how dose [sic] feel."

## B. Proceedings Leading to Deere's Guilty Plea

On the afternoon of March 9, 1982, after Deere's arrest but before appointment of defense counsel, Dr. Tommy Bolger interviewed Deere at the jail. Dr. Bolger had never received formal psychiatric training. He had received a degree of Doctor of Osteopathic Medicine in 1957 and had become a Medical Doctor in 1962 as a result of the California Reunification Act. Dr. Bolger spent most of his career working in the California state prison system. From 1965 to 1970, he worked under the classification "Physician and Surgeon II" at Patton State Hospital. He then worked as a "Chief Medical Officer" at San Quentin prison in 1975 and a "Physician and Surgeon" at Soledad prison from 1975 to 1977. He received a classification as a "Staff Psychiatrist" at

Soledad in 1977. He voluntarily resigned from state service in 1979 and moved to Blythe, where he worked for Riverside County as a "medical and psychiatric consultant."

Dr. Bolger spoke with Deere for an hour and five minutes. He prepared a report for the police in which he stated, "His intellectual capacity is adjudged a dull normal," and "Judgement is narrowed and constricted." Dr. Bolger provided what he called a "diagnostic impression": "1) Not mentally ill[.] 2) Dependant personality type, with explosive features, Alcohol and drugs a factor. 3) Antisocial personality type, with borderline features, not psychotic." Dr. Bolger concluded:

> Mr. Deere is not mentally ill. He has a severe personality problem. He does understand the nature and [sic] the charges against him and was certainly capable of forming the intent and then carrying out the action. He is capable of cooperating with Counsel in his defense, if he feels it is to his advantage.

Dr. Bolger had interviewed Deere a year earlier in connection with treatment of Deere's father for seizures and mental health problems linked to alcoholism. At that time, Dr. Bolger had concluded that statements by Deere were "merely [Deere's] attempt to blame his problems on someone else." Dr. Bolger did not disclose in his report to the police that he had previously interviewed and formed an impression of Deere. He testified in 1986 that he had had no knowledge of Deere before the 1982 jail interview.

The day after Deere's jail interview with Dr. Bolger, the court appointed deputy public defender Glenn Jones to

represent Deere. Deere told Jones that he did not want a trial, did not want a defense, and wanted to be executed. Deere refused to discuss the facts of the case with Jones and insisted on pleading guilty.

Deere initially pled not guilty, but later moved to change his plea to guilty. On the recommendation of the prosecutor, the court appointed Dr. Bolger to evaluate Deere's competence before taking his guilty plea. The prosecutor represented to the court that Dr. Bolger was a board-certified psychiatrist. Dr. Bolger himself sometimes represented that he was a board-certified psychiatrist, even though he was not. It appears to have been common knowledge in the community that Dr. Bolger was not a qualified psychiatrist. Dr. William Jones, the psychologist that attorney Jones later retained to evaluate Deere for mental health defenses, testified in the district court that attorney Jones

> characterized Dr. Bolger as sort of a hack. No
> one else would go to Blythe, so they used him
> in that area. It was someone who had no
> formal psychiatric training whatsoever[.]

Dr. Bolger interviewed Deere for about an hour and a half on June 19, 1982, and submitted a short report to the court on June 21. Dr. Bolger wrote that Deere had been given two intelligence tests. In his earlier report to the police, Dr. Bolger had written that Deere's intellectual capacity was "dull normal," and that he had "narrowed and constricted" judgment. But in the June report to the court, Dr. Bolger reported that Deere was intelligent and had good judgment. Dr. Bolger wrote: "He is given verbal Wechsler and verbal O[fficer] I[ntelligence] T[est] and scores adequately in the high percentile range." "Judgement as tested by verbal skills

in aforementioned verbal testing is excellent. . . . His I.Q. would be adjudged to be in the high range of normal." There is no indication in the record that Dr. Bolger's earlier report to the police was ever submitted to the court. Dr. Bolger did not reveal in his report to the court that he had prepared a report for the police or that he had interviewed and formed an impression of Deere a year earlier. Dr. Bolger concluded in his report to the court that Deere was competent to plead guilty.

On June 25, Deere pled guilty to three counts of murder and admitted a special circumstance allegation. At the time of Deere's plea, attorney Jones had requested but had not yet received a psychological evaluation. Attorney Jones had seen the scars of self-inflicted wounds on Deere's arms, chest, and abdomen. He had recognized signs of possible mental illness and had requested funds from the court to retain mental-health experts. (Jones ultimately spent only $1,696.86 of the $5,000 the court awarded for this purpose.) Jones contacted Dr. William Jones, Ph.D. (no relation), a licenced psychologist, and asked him to do a general psychological evaluation of Deere.

Deere initially refused to see Dr. Jones. He agreed to see Dr. Jones only on the condition that Attorney Jones allow him to plead guilty. Dr. Jones interviewed Deere twice. The first interview took place two days before Deere pled guilty. The second interview took place a week later. The first interview took an hour and a half, followed by two and a half hours of psychological testing. The second interview lasted only thirty minutes. Dr. Jones testified in the district court that Deere refused to complete the second interview because "he was not able to deal with the emotions" of discussing the crime or the death penalty.

Attorney Jones did not ask Dr. Jones to evaluate Deere's competence to plead guilty. Dr. Jones testified in the district court that it was standard procedure in the profession in 1982 not to give an opinion on competence unless asked to do so. Dr. Jones wrote in his report that Deere frequently cut himself to avoid hurting others, "has a very major alcohol abuse problem," and "ha[s] a major drug abuse problem." He reported that Deere's full-scale I.Q. on the "Wechsler Adult Intelligence Scale-Revised" tested at the 7th percentile, or borderline retarded. Deere's Wechsler "verbal I.Q." tested "at the 6th percentile, also in the borderline range." (Recall that Dr. Bolger reported to the court that Deere had scored "in the high percentile range" on this same Wechsler test.) The tests showed, further, that Deere had reading recognition at about the sixth grade level, in the fifth percentile of persons his age; spelling at the fourth grade level, in the first percentile; and arithmetic at the third grade level, in the fifth percentile.

Dr. Jones diagnosed Deere as having an adjustment disorder with depressed mood, mixed substance abuse disorder, and borderline personality disorder with anti-social aspects. Dr. Jones wrote that Deere had had a long-standing desire to be killed, and that he pled guilty so that the State would fulfill this desire:

> He feels that suicide cannot be forgiven, but that it is permissible for someone else to kill him. Consequently, he states that he has frequently asked others to kill him and stab him. He has even paid money for this and on one occasion apparently was stabbed.

> Presently Mr. Deere states that he does not
> care in the slightest what happens to him. He
> states that if he is given the death penalty he is
> willing to accept it and indeed would prefer it
> to life imprisonment. He thinks this would
> make him feel better, but he is unclear as to
> how he would feel better if he were dead.

Dr. Jones testified at the evidentiary hearing in the district court that he had been concerned about Deere's competence, and had expressed his concerns orally to attorney Jones:

> I have a recollection that we talked either in
> person — I believe in person or on the
> telephone before I prepared the report. I
> recall having a — this conversation sticks in
> my mind more vividly than anything else
> about this case. The issue on one hand, my
> reservations that he was so self-destructive
> and on [attorney Jones's] hand the idea . . .
> that opting for the death penalty was, in fact,
> a rational thing for Mr. Deere to do at the time
> and not, in fact, a — something reflecting
> incompetence.

When asked at the evidentiary hearing if in 1982 he had "felt Deere was incompetent" and had "in essence . . . told [attorney Jones] that," Dr. Jones replied, "Yes."

## C. District Court Proceedings

The district court conducted extensive proceedings after our 2003 remand. The State and Deere both introduced evidence concerning Deere's competence in 1982.

## 1. The State's Evidence

The State's evidence consisted of Dr. Bolger's reports and the report and testimony by Dr. Park Dietz. Dr. Bolger had died by the time of the district court hearing, so the State relied on the two reports he prepared in 1982, both of which are described above.

Dr. Dietz is a board-certified psychiatrist, but he has not treated patients since 1988. He testified that he is the "head" of two corporations, one of which provides expert psychiatric testimony in criminal cases. This firm employs a substantial staff of experts "from various disciplines." Dr. Dietz described the manner in which his firm prepares cases:

> Basically, we seek to obtain all the relevant documents that we can foresee or that the client allows us to know exists. So we typically send a list of documents that we're requesting. . . . And then depending on the complexity of the case, the quantity of the documents sometimes more than one expert will work on it. On a simple case with a small stack of documents often that will just be one person's work. But if there are multiple issues, multiple areas of expertise or extensive documents, we'll often involve additional experts on the case.

Dr. Dietz has testified in a number of high-profile criminal cases in federal and state court. In somewhere between 80 percent to 90 percent of the cases, Dr. Dietz has testified for the prosecution.

Dr. Dietz did not interview Deere. He testified that his declaration and his testimony were primarily based on the observations of attorney Jones and to some degree on the reports of Dr. Bolger. Dr. Dietz concluded in his declaration, "Mr. Deere was, in my judgment, competent each time he was examined by the court," including the occasion on "6/25/92 [sic], when Mr. Deere advised the court that it was his wish to change his plea from not guilty to guilty on all counts." Dr. Dietz testified that Deere's history and symptoms were "proof" that he had "a borderline personality disorder." He testified, "Mr. Deere's borderline personality disorder did not in my view make him incompetent to enter into the decisions he did in 1982."

Dr. Dietz relied for his diagnosis in substantial part on a number of statements made by attorney Jones. For example, Dr. Dietz quoted Jones as saying, "He knows the consequences of every decision he's made, as well as the consequences of his criminal acts. . . . They are rational, intelligent decisions by a man who realizes what he has done and says, 'This is the only position I can take to show you that I am still a man and not an animal.'"

Dr. Dietz also testified that he trusted Dr. Bolger's "observations":

> Dr. Bolger's report contains enough descriptive information of Dr. Bolger's observations to support the opinion he offers in this report. And judged by the standards of the day, it was an average or above average competency evaluation.

Dr. Dietz admitted that Dr. Bolger had made a mistake in "estimating" Deere's I.Q. He wrote in his declaration:

> Dr. Bolger could be faulted by the standards of the day for *estimating* Mr. Deere's IQ as too high ("high range of normal") in his report of 6/21/82 and for less than laudatory writing skill.

(Emphasis added.) Dr. Dietz described in his district-court testimony how he thought Dr. Bolger had arrived at his "estimate" that Deere's I.Q. was in the "high range of normal":

> Well, what he did was an impressionistic evaluation of intelligence, which was fairly common then and many people still do it which is give an off-the-cuff idea of whether they think someone is above average or below average *without any testing* of that. And his off-the-cuff finding was wrong.

(Emphasis added.) Deere's attorney asked Dr. Dietz whether Dr. Bolger's mistake in his "estimate" of Deere's I.Q. was "a fatal error in his report that makes his conclusion erroneous?" Dr. Dietz replied, "No. The only way it could be is *if it turned out by objective evidence that Mr. Deere was mentally retarded.*" (Emphasis added.)

Dr. Jones had concluded in 1982 that Deere was incompetent to plead guilty because he had long felt a compulsion to seek death, had felt that it wrong for him to kill himself, and had desired to be killed by someone else. Deere's three other professional witnesses agreed with Dr.

Jones's conclusion that Deere's mental illnesses drove his compulsion to die and thus his decision to plead guilty. Dr. Dietz disagreed with the conclusion that Deere had a "compulsion" to seek death. However, his disagreement was based on a narrow technical definition of "compulsion" that requires the sufferer of the disorder to be self-aware, such that the sufferer is himself aware that his actions are "excessive or unreasonable."

Dr. Dietz made two obvious mistakes in his testimony. First, Dr. Dietz stated that Dr. Bolger could be forgiven for merely "estimating" Deere's I.Q. "without any testing." Dr. Dietz had not been told, or perhaps did not remember, that Dr. Bolger had not merely "estimated" Deere's intelligence. Rather, Dr. Bolger had performed two separate intelligence tests. Dr. Bolger had stated in his report to the court: "He is given verbal Wechsler and verbal O[fficer] I[ntelligence] T[est] and scores adequately in the high percentile range."

Second, Dr. Dietz minimized the importance of Dr. Bolger's mistaken "estimate" of Deere's I.Q. on the ground that there was no "objective evidence" that Deere was "mentally retarded." Dr. Dietz had not been told, or perhaps did not remember, that there was indeed objective evidence of mental retardation. Dr. Jones had stated in his report in 1982 that he had tested Deere's full-scale and verbal I.Q.s, and had found that Deere was borderline retarded.

## 2. Deere's Evidence

Deere's evidence at the district court evidentiary hearing consisted primarily of evaluations by four doctors — Dr. Jones, Dr. Fred Rosenthal, Dr. Armando Favazza, and Dr. Pablo Stewart. Two of the four doctors had personally

interviewed Deere. All four of them concluded that Deere was not competent to plead guilty in 1982.

As noted above, Dr. Jones interviewed Deere twice in 1982, just before and just after Deere pled guilty, and prepared a contemporaneous report. Dr. Jones wrote in a 1993 declaration:

> Mr. Deere . . . had a compulsion to be punished with the death penalty and did not want anyone to interfere with that. Mr. Deere's insistence on pleading guilty was part of that compulsion and an outgrowth of his mental disturbances; it was irrational. . . . Mr. Deere was extremely self-destructive to begin with and teetered throughout his life on the edge of suicide, as evidenced most dramatically by his history of self-mutilation. . . . In sum, it appeared to me that Mr. Deere was so bent on self-destruction that it disabled him from cooperating in a meaningful way with the presentation of a defense and caused him to solicit the death penalty. . . . Mr. Deere's personality was one of denial about his inadequacies, and his ability to correctly perceive reality was limited. It would have been naive to take Mr. Deere at face value because he was not thinking logically.

Dr. Jones concluded:

> In my opinion, which I hold to a reasonable degree of professional certainty, Mr. Deere

was not competent to aid and assist counsel in the conduct of a defense in a rational manner due to his mental disabilities, which compelled him to seek death. Mr. Deere simply was not able to make logical judgments about his defense; rather, he had a compulsion to be punished with the death penalty and did not want anyone to interfere with that. Mr. Deere's insistence on pleading guilty was an irrational part of that compulsion and an outgrowth of his mental disturbances.

Dr. Jones testified in the district court to the same effect as his 1993 declaration. He emphasized that Deere had wanted someone to kill him long before the murders:

[Deere] reported that he had asked other people to kill him before. He did not believe in suicide, but he believed it would be okay if someone else killed him. . . . In my view, his wanting the death penalty . . . was just kind of an extreme amount of masochistic behavior and self-destruction, efforts to destroy himself. He was strongly motivated in that direction at that time.

Dr. Jones testified further "that was my conclusion, [in 1982,] that some of his acting out behavior was quite prov[o]cative towards others, and my belief was that he desired . . . to be killed." Dr. Jones testified that Deere told him that he had even paid others to kill him.

Dr. Rosenthal is a board-certified psychiatrist.   He
examined Deere twice in December 1992 and prepared a
declaration in early 1993.   Dr. Rosenthal concluded that
Deere was incompetent in 1982. He wrote in his declaration:

> Mr. Deere purported to enter a guilty plea,
> but arrived at that decision under compulsion
> and substantial pressure from a person on
> whom he was extremely dependent.  He was
> held in solitary confinement and made
> constantly aware of threats against his life by
> persons inside and outside the jail.  He was
> repeatedly interrogated, including three
> interviews by his former common-law wife,
> Cindy Gleason, and he was repeatedly told
> that he had committed the crimes and
> deserved to die.
>
> There is substantial evidence that his
> thought processes were illogical and disturbed
> during the period of his incarceration.  For
> example, he continued to write to Cindy
> Gleason, proclaiming his love for her, despite
> her repeated insistence that he deserved to die
> and was less than a man. . . .
>
> In my professional opinion, which I hold
> to a reasonable degree of medical certainty,
> Mr. Deere's multiple mental impairments,
> exacerbated by pressures from his former
> girlfriend and the conditions of his
> confinement, rendered him incompetent to
> rationally comprehend his trial proceedings or
> to aid and assist counsel at trial.  I concur in

> the conclusion of William Jones, Ph.D., who examined Mr. Deere at the time of his plea, and would have advised he was not competent to stand trial.

Because the State had not been able to examine Deere after 1982, and because there was concern that it might therefore be unfair to allow testimony about Dr. Rosenthal's 1992 examination of Deere, Dr. Rosenthal did not describe his interviews with Deere in his district-court testimony. However, Dr. Rosenthal's 1993 declaration was entered into the district-court record.

Dr. Armando Favazza is a board-certified psychiatrist. He is an expert on the psychology of people who cut themselves. Dr. Favazza reviewed Deere's personal history and records, noting Deere's troubled and violent family history, alcohol abuse, depression, and his "prodigious" self-mutilation. Dr. Favazza concluded that Deere was incompetent in 1982 because he possessed a "pathological fixed idea that he must be killed." Dr. Favazza testified that Deere's fixed idea, formulated in early childhood

> remained with him to this very day and is a core, central, pathological idea and is preventing him from cooperating with his counsel. He just wants to die, and he's in a perfect situation right now because he can have the state kill him, and this is what he wants.

Dr. Pablo Stewart is a board-certified psychiatrist. He is also an examiner with the American Board of Psychiatry and Neurology, which grants board certification for psychiatrists.

Dr. Stewart also reviewed Deere's personal history and records. He concluded that Post-Traumatic Stress Disorder was Deere's primary condition, and that its interaction with Deere's depression, substance abuse, and possible organic brain damage rendered him incompetent. Dr. Stewart's assessment of Deere's competence matched that of Drs. Jones, Rosenthal and Favazza. He testified:

> Based on the totality of the record, it is my opinion that [Deere's] pleading guilty and wishing to be executed was not an independent decision but rather colored by, affected by[,] and was a result of his underlying psychiatric condition.

### 3. District Court Decision

Ineffective assistance of counsel requires a showing of both deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The State does not dispute that Jones performed deficiently. It contends only that there was a lack of prejudice. Prejudice requires that there be a "reasonable probability" that counsel's deficient performance affected the outcome of the case. The Court wrote in *Strickland*, "[W]e believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case. . . . The defendant must show that there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 693–94 (emphasis added). *See also Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *Howard v. Clark*, 608 F.3d 563, 568 (9th Cir. 2010).

The district court held that Deere established IAC by Jones. Because Dr. Jones was the only qualified professional who had performed a contemporaneous examination, the court relied most heavily on Dr. Jones's conclusion. The court also relied, though less heavily, on the conclusion of Dr. Rosenthal, who examined Deere in 1992, and on the conclusions of Drs. Favazza and Stewart. The district court discounted Dr. Bolger's conclusion on the ground that Dr. Bolger was an unqualified evaluator who lied about his qualifications. The court considered Dr. Dietz's conclusion, but weighed it against the contrary conclusions of Drs. Jones, Rosenthal, Favazza and Stewart. The court held that there was a reasonable probability that, had attorney Jones adequately developed the record in 1982, Deere would have been found incompetent to plead guilty. The court gave its reasons in a careful forty-nine-page order. I agree with the district court.

## D. Majority's Disagreement with the District Court

The majority disagrees with the district court. Its reasons are unconvincing.

First, the majority relies heavily on Dr. Bolger's conclusion that Deere was competent. It tries mightily to make Dr. Bolger into something other than an unqualified imposter, repeatedly referring to Dr. Bolger as a "psychiatrist" and refusing to admit that Dr. Bolger lied when he claimed in sworn testimony that he was board-certified in psychiatry. Op. at 4, 8–9 and n.1, 49. However, the parties jointly stipulated in the district court: "Dr. Bolger was never board certified, and his educational credentials did not qualify him for board certification."

Second, the majority contends that Dr. Bolger and Dr. Jones came to the same conclusions about Deere's competence in 1982. Op. at 48–49. This is not true. As a preliminary matter, I note the obvious: Dr. Bolger's report responded to the court's question whether Deere was competent to plead guilty. Dr. Jones's 1982 report did not purport to answer that question. More fundamentally, Dr. Bolger's and Dr. Jones's conclusions about Deere's mental state were strikingly different. Indeed, Dr. Bolger wrote two reports, whose conclusions are themselves strikingly different.

Dr. Bolger's report to the police (which may not have been submitted to the court) contained a "diagnostic impression" that Deere had, inter alia, an "[a]ntisocial personality type, with borderline features, not psychotic." It assessed Deere as having a "dull normal" "intellectual capacity," and having "narrowed and constricted" judgment. Dr. Bolger's report to the court described a very different mental state. Dr. Bolger stated that Deere had scored "in the high percentile range" on two I.Q. tests, one of which was the Wechsler Verbal I.Q. test. Dr. Bolger wrote further, "Judgement as tested by verbal skills in aforementioned verbal testing is excellent. . . . His I.Q. would be adjudged to be in the high range of normal." Dr. Bolger concluded: "He displays no evidence of psychosis or abnormal thinking and of course no mental illness is evident."

Dr. Jones provided a single report, based on two interviews and testing. Dr. Jones provided a more extensive discussion of Deere's background and family history than either of Dr. Bolger's reports. Unlike Dr. Bolger, who had provided only a "diagnostic impression" in his first report and no "diagnosis" at all in his second report, Dr. Jones provided

a formal diagnosis: "Adjustment disorder with depressed mood[;] Mixed substance abuse disorder, including abuse of alcohol, marijuana, stimulants, a[m]phetamines, etc.[;] Borderline personality disorder with anti-social aspects." Also unlike Dr. Bolger, who had reported in his first report that Deere had above average intelligence, Dr. Jones reported that Deere was borderline retarded.

Most important, Dr. Jones provided an analysis of Deere's mental state that was entirely lacking from either of Dr. Bolger's reports. Dr. Jones described Deere's long-standing desire to die at someone else's hand, which had led to his desire to plead guilty. Dr. Jones wrote, "He feels that suicide cannot be forgiven, but that it is permissible for someone else to kill him. Consequently, he states that he has frequently asked others to kill him and stab him. He has even paid money for this and on one occasion apparently was stabbed." Dr. Jones wrote in the last two sentences of his report: "There are self-destructive inclinations, but they are blocked from expression in suicide. Some of his acting out behavior may have been an effort to get others to kill him."

Third, the majority relies on the observations of Judge Metheny, attorney Jones, and the prosecutor. It emphasizes that these people had opportunities to observe Deere, and that none of them concluded that he was incompetent to plead guilty. The relevant time period is 1982, so I do not discount Judge Metheny's observations on the ground that he was incompetent. But I do note that the opportunities for observation by Judge Metheny and the prosecutor were limited.

More important, mental illness is often not detectable by a lay person. Dr. Stewart testified that those who are

mentally ill often "mask" symptoms, and that "people in the criminal justice system will go to great lengths to hide the severity of mental illness where, in fact, their behavior is incompetent, but it's not seen that way cause they don't see it as mental illness." Dr. Stewart testified further that "the fact that the judge, his counsel, bailiffs[,] all these other people thought he was competent, that doesn't help me one way or the other." Dr. Rosenthal also testified that a competency determination cannot be based on a layperson's view: "I don't think the layperson may pick up things that suggest there's some doubt about competency. It would be a mistake to rely on the layperson's judgment to assess whether somebody is competent or not competent."

Deere's professional witnesses cautioned against being taken in by Deere's apparent rationality. Dr. Rosenthal testified that taking "what the client says at face value"

> can be a real trap. Because one of the problems of not understanding much about mental illness and the way it presents is that you can get people telling you things that look very legitimate and reasonable when they're really not and the person is operating in an entirely different world from the one you're in.

Dr. Favazza agreed. He concluded that Deere tricked attorney Jones into believing that his decision was rational. Dr. Jones testified, "I did not think that you could take Mr. Deere at face value. He — I don't think he used his rational thinking of doing much of anything in his life, but he would offer rationalizations after the fact at times."

Fourth, the majority contends that the facts of the crimes and the transcripts of Deere's guilty plea proceedings show that he was not "out of touch with reality," and that he "actually understood what was going on." Op. at 50–51. The majority misses the point. Drs. Jones, Rosenthal, Favazza, and Stewart did not conclude that Deere was incompetent to plead guilty based on a disconnection from reality that prevented him from understanding what was "going on." Rather, they concluded that Deere's mental illnesses drove his strong desire to die at the hand of someone else. This desire long predated his crime, and so strongly compelled him to plead guilty that he was prevented from making a rational choice.

Finally, the majority writes, "Eleven years after Deere pled guilty, habeas counsel came forward with newly-obtained opinions to the effect that Deere's plea was motivated by an irrational desire to be put to death, rendering him incompetent and his plea invalid." Op. at 50. In disparaging what it calls "these belated opinions," the majority ignores Dr. Jones's report, prepared in 1982. Op. at 52. Dr. Jones described in his report Deere's long-standing desire to be killed by someone else, such that seeking the death penalty would fulfill that desire. Far from being a "belated opinion," this is a contemporaneous opinion by the only qualified professional who examined Deere in 1982.

Deere's three other professional witnesses agreed with Dr. Jones. All four witnesses testified to the same thing — that Deere suffered from mental impairments producing a compulsion to seek death at the hand of someone else, that a plea of guilty followed by execution would satisfy Deere's deep-seated and irrational need, and that Deere's compulsion prevented him from making a rational choice. In the words

of Dr. Favazza, "He just wants to die, and he's in a perfect situation right now because he can have the state kill him, and this is what he wants."

## Conclusion

There is no greater judicial responsibility than deciding whether a person shall live or die at the hands of the state. The majority makes a grievous error in holding that no hearing was required on the competence of Judge Metheny to sentence Deere to death in 1986. The majority similarly errs in holding that no hearing was required as to whether Jones was ineffective in failing to seek to disqualify Judge Metheny. Finally, the majority errs in holding that Jones did not commit ineffective assistance of counsel in failing to investigate Deere's competence to plead guilty in 1982.

I respectfully but emphatically dissent.